UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

**BALTIMORE CITY BOARD OF SCHOOL COMMISSIONERS; BOARD OF EDUCATION OF EUNICE PUBLIC SCHOOLS; GALLUP-MCKINLEY COUNTY SCHOOLS; LASSEN COUNTY OFFICE OF EDUCATION; SUSANVILLE SCHOOL DISTRICT; REGIONAL SCHOOL UNIT 34 BOARD OF EDUCATION; BOARD OF EDUCATION OF PORTLAND SCHOOL DEPARTMENT; PUTNAM COUNTY SCHOOL DISTRICT; HAMBLEN COUNTY BOARD OF EDUCATION; MASON COUNTY BOARD OF EDUCATION; MARION COUNTY BOARD OF EDUCATION; and WYOMING COUNTY BOARD OF EDUCATION,**

**FOR THEMSELVES AND OTHERS SIMILARLY SITUATED,**

*Plaintiffs*,

vs.

**PUBLICIS HEALTH, LLC; PRACTICE FUSION, INC.; and ZS ASSOCIATES, INC.**

*Defendants*.

**Case No. 24-cv-11435**

Judge Manish S. Shah

# FIRST AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................ 1

II. JURISDICTION AND VENUE ........................................................ 3

III. PARTIES ........................................................ 3

Plaintiffs ........................................................ 3

Defendants ........................................................ 5

IV. FACTUAL ALLEGATIONS ........................................................ 7

A. The Development, Manufacture, and Marketing of Opioids ........................ 8

B. Publicis' Role in Catalyzing the Opioid Crisis ........................ 16

C. Practice Fusion's Role in Catalyzing the Opioid Crisis ........................ 20

D. ZS Associates' Role in Catalyzing the Opioid Crisis ........................ 22

E. Teamwork ........................................................ 24

V. ACCOUNTABILITY ........................................................ 26

VI. DEFENDANTS' CONDUCT TOLLING THE STATUTE OF LIMITATIONS ............ 29

A. Fraudulent Concealment ........................................................ 29

B. Equitable Tolling ........................................................ 29

C. No Lapse of Time Can Legalize a Continuing Public Nuisance, for which There is No Statute of Limitations. ........................ 30

VII. SCHOOL DISTRICT INJURIES ........................................................ 31

VIII. CLASS ALLEGATIONS ........................................................ 32

IX. CAUSES OF ACTION ........................................................ 34

COUNT I: Common Law Public Nuisance ........................ 34

COUNT II: Negligence ........................................................ 35

COUNT II: Gross Negligence ........................................................ 37

COUNT IV: Civil Conspiracy (Vicarious and Accessory Liability) .................... 37

COUNT V: Aiding and Abetting (Vicarious and Accessory Liability) ............... 38

X. JURY DEMAND ........................................................ 38

XI. PRAYER FOR RELIEF ........................................................................................39

## I. INTRODUCTION

**1.** The thrust of this First Amended Complaint is the claim that Defendants bear responsibility and liability for participating in a hub-and-spoke conspiracy with numerous allied opioid manufacturer clients to collaboratively and fraudulently market opioids as safe and nonaddictive treatments, suitable for all kinds of pain and for long term use—knowing that none of that was true.

**2.** In a "hub-and-spoke" conspiracy, a central mastermind (or "hub") coordinates with secondary co-conspirators (or "spokes") to further a shared illegal purpose. See *United States v. Newton*, 326 F.3d 253, 255 n.2 (1st Cir. 2003). The shared illegal purpose here was to influence doctors to prescribe more and more opioids—at higher and higher doses, for longer and longer, and to patients who didn't need them or weren't suitable candidates. The masterminds (or "hub") of the conspiracy included Purdue Pharma, a drug manufacturer focused mostly on opioids, including its blockbuster opioid drug Oxycontin, which generated sales in the billions of dollars, and the global consultancy McKinsey & Company. The "spokes" of the conspiracy included the defendants named in this complaint—Publicis, Practice Fusion, and ZS Associates—all of which performed essential roles for multiple opioid manufacturers alongside McKinsey, without which the conspiracy likely could not have succeeded. Publicis was Purdue's principal marketing partner, its "agency of record," and the self-described "strategic backbone" of Purdue's opioid marketing efforts. Practice Fusion, recruited to the conspiracy by Publicis, embedded banner ads (or "alerts") in patients' electronic health records, prompting physicians to consider opioid prescriptions more than 230 million times between 2016 and 2019. ZS, working for nearly every major opioid manufacturer—including Purdue, Endo, Teva, and Janssen—advised them how to identify and "target" high-prescribing physicians and deploy sales reps to maximize opioid sales.

**3.** This conspiracy to expand the size of the overall opioids market has been extensively documented in other cases—though without the details added here about the distinct roles of defendants Publicis, Practice Fusion, and ZS. See *In re McKinsey & Co., Inc. Nat'l Opiate Consultant Litig*., 637 F. Supp. 3d 773, 780 (N.D. Cal. 2022) (noting allegations of the multi-year orchestrated effort to "turbocharge" opioid sales by specifically targeting thousands of high-prescribing doctors across all 50 states, despite knowing the severe harm that increasing the supply of opioids was inflicting); *In re: McKinsey & Co., Inc.*, *Nat'l Opiate Consultant Litigation,* No. 21-md-02996-CRB, ECF592-3 (First Amended Master Complaint) (School Districts); *In re Nat'l Prescription Opiate Litig*., No. 1:17-MD-2804, 2019 WL 4178610 (N.D. Ohio Sept. 3, 2019) (denying manufacturer defendants' motions for summary judgment on conspiracy claims by pointing to evidence that opioid manufacturers had worked together, in alliance, undertaking coordinated efforts to collaboratively grow the market for opioids in knowing disregard of their duties under the Controlled Substances Act and its regulations and through false representations); *City of Chicago v. Purdue Pharma L.P. et al.*, (Fourth Amended Complaint, filed as ECF 511 in MDL 2804, *In re Nat'l Prescription Opiate Litig.*) (describing opioid manufacturers' wildly successful campaign to fraudulently market opioids as safe for treating chronic pain by fabricating "scientific" evidence and knowingly misrepresenting and trivializing the risks of addiction, overdose, and death—resulting, by 2012, in 259 million prescriptions for opioid pain killers in the United States, enough to medicate every adult in the country around the clock for a month, with catastrophic results).

**4.** As described in this Complaint, the industry-wide, multi-level conspiracy to maximize opioid sales—by using fraudulent advertising, deceptive messaging, and fabricated "research" to induce doctors and patients to prescribe and take opioids for conditions for which

they were neither indicated, effective, nor safe—could not have succeeded without Defendants' contributions. Conceived by McKinsey and first implemented for Purdue Pharma, this conspiracy was a textbook example of ostensible "rivals" joining forces to grow the "pie" rather than competing for slices. The conspirators' tactics and strategies were then carried from one manufacturer to another by intermediaries and third-party enablers, including Publicis, Practice Fusion, and ZS (the Defendants here), often working with or alongside McKinsey.

## II. JURISDICTION AND VENUE

**5.** This court has jurisdiction over this matter under 28 U.S.C. 1332(d)(2) — because the amount in controversy exceeds $5,000,000, and this is a proposed class action in which at least one member of each proposed plaintiff class is a citizen of a State different from one defendant.

**6.** Venue is proper in this District because a substantial number of the events giving rise to Plaintiffs' claims occurred in, were directed to, or emanated from this District and because at least one Defendant, ZS Associates, resides in the district. 28 U.S.C. § 1391(b).

## III. PARTIES

### Plaintiffs

**7.** Plaintiff **Baltimore City Board of School Commissioners** operates a system of public schools in Baltimore City commonly known as the Baltimore City Public School System or Baltimore City Public Schools ("City Schools"). City Schools has an enrollment of approximately 76,841 students. City Schools sues here on behalf of itself and all other independent school districts in the State of Maryland.

**8.** Plaintiff **Board of Education of Eunice Public Schools ("Eunice")** operates a system of public schools with an enrollment of approximately 722 students in Eunice, New Mexico.

**9.** Plaintiff **Gallup McKinley County Schools** (**"Gallup McKinley**") operates a system of public schools with an enrollment of approximately 12,439 students in Gallup-McKinley County in New Mexico.

**10.** Eunice and Gallup McKinley sue here on behalf of themselves and all other independent school districts in the State of New Mexico.

**11.** Plaintiff **Lassen County Office of Education** (**"Lassen County")** is a California county office of education which provides essential and necessary resources, services, and supports to the 3,700 students attending public schools in Lassen County California.

**12.** Plaintiff **Susanville School District** (**"Susanville")** operates a system of public schools with an enrollment of approximately 3,989 students in Susanville, California.

**13.** Lassen County and Susanville sue here on behalf of themselves and all other local educational agencies in the State of California.

**14.** Plaintiff **Regional School Unit 34 Board of Education ("RSU 34")** is the governing body for Regional School Unit 34 in Maine and has an enrollment of approximately 1,410 students.

**15.** Plaintiff **Board of Education of Portland School Department ("Portland")** operates a system of public schools in Portland, Maine with an enrollment of approximately 6,649 students.

**16.** RSU 34 and Portland sue here on behalf of themselves and all other independent school districts in the State of Maine.

**17.** Plaintiff **Putnam County School District** (**"Putnam**") operates a system of public schools with an enrollment of approximately 10,178 in Putnam County, Florida. Putnam sues here on behalf of itself and all other independent school districts in the State of Florida.

**18.** Plaintiff **Hamblen County Board of Education ("Hamblen")** is the governing body for the Hamblen County Schools in Tennessee. The school system has an enrollment of approximately 10,287 students. Hamblen sues here on behalf of itself and all other independent school districts in the State of Tennessee.

**19.** Plaintiff **Mason County Board of Education** (**"Mason"**) is the governing body for the Mason County Schools in West Virginia. The school system has an enrollment of approximately 3,632 students.

**20.** Plaintiff **Marion County Board of Education** (**"Marion"**) is the governing body for the Marion County Schools in West Virginia, with an enrollment of approximately 7,291 students.

**21.** Plaintiff **Wyoming County Board of Education** (**"Wyoming"**) is the governing body for the Wyoming County Schools in West Virginia, with an enrollment of approximately 3,453 students.

**22.** Plaintiffs Mason, Marion, and Wyoming sue on behalf of themselves and all other independent school districts in the State of West Virginia.

**<u>Defendants</u>**

**23.** Defendant **Publicis Health, LLC ("Publicis")** is a Delaware limited liability company with its principal place of business in New York City. Publicis maintains an office within this judicial district at 35 W. Wacker Drive, Chicago, IL 60601, is registered to do business in Illinois, and maintains a registered agent with a registered office in Illinois, CT Corporation Company, 208 S. LaSalle St., Ste. 804, Chicago, IL 60604. At all times relevant to this proceeding, Publicis did business in Illinois, intentionally availing itself of the Illinois market. As used in this complaint, "Publicis" includes, collectively, Publicis Health, LLC and its networked American

affiliated entities that worked on opioid related matters from 2000 through 2021, including, but not limited to: Razorfish Health, LLC; Verilogue, Inc.; Publicis Health Medica, LLC; Rosetta Marketing Services, LLC; Saatchi & Saatchi Healthcare Communications, Inc., d/b/a/ Razorfish Health; Publicis Touchpoint Solutions; and Arista Marketing. Under Publicis' "Power of One" business model, these affiliates agencies work together. Publicis Groupe, which owns Publicis, is the largest advertising conglomerate in the world.

**24.** Defendant **Practice Fusion, Inc. ("Practice Fusion")** is a Delaware corporation with its headquarters in San Francisco, California. Practice Fusion provides electronic health record ("EHR") services to clinicians and healthcare providers, among them clinicians and healthcare providers in Illinois to whom the company advertises its platforms as a tool both for complying with Illinois state mandates and reporting Illinois patients' immunization records. In 2018, Practice Fusion was purchased by Allscripts, Inc., another EHR vendor. In 2023, Allscripts subsequently changed its name to Veradigm, Inc. Practice Fusion may be served with process through its registered agent, National Registered Agents, Inc., at 818 West Seventh St., Ste 930, Los Angeles, CA 90017.

**25.** Defendant **ZS Associates, Inc**. **("ZS")**, is an Illinois corporation with headquarters at 1800 Sherman Avenue, Suite 700, in Evanston, Illinois. ZS has more than 13,000 employees in more than 35 cities around the world. It is a management consulting and technology firm. It partners with commercial organizations to help with sales and marketing issues, such as sales force design, training, and deployment, customer targeting, marketing strategy, business intelligence, and customer communication. ZS may be served with process through its registered agent, Illinois Service Corporation, at 801 Adlai Stevenson Dr., Springfield, IL 62703.

## IV. FACTUAL ALLEGATIONS

**26.** Once upon a time, opioids were prescribed in limited quantities in limited circumstances—mostly for short-term use for postsurgical pain and for end-of-life care. But between 1999 and 2012, the volume of opioids dispensed by prescription *quadrupled* in this country, substantially because of Defendants' fraudulent marketing efforts, which encouraged longer-term and higher dose prescriptions for more and more patients. By 2012, the overall national opioid dispensing rate was 81 opioid prescriptions per 100 persons. Most of these prescriptions were written for patients with conditions for which treatment with opioids was neither indicated, effective, nor safe, and many were written to patients who were known abusers and diverters.

**27.** By common consensus, the opioid crisis began with Purdue Pharma's introduction of the opioid painkiller OxyContin in 1996. By 2023, more Americans died from opioid overdoses than from vehicle crash and gun deaths combined. Some 5.7 million Americans aged 12 and older struggle with opioid use disorder (OUD). And every 15-25 minutes, an infant is born in this country with neonatal opioid withdrawal syndrome ("NOWS"). That's 25,000 "addicted" newborns a year. (NOWS is also sometimes referred to as neonatal abstinence syndrome or "NAS").

**28.** The focus of this complaint is on the costs that public schools must bear to provide needed, costly, and federally mandated services to the now *hundreds of thousands* of students who were exposed to opioids in utero. Because of their exposure to opioids in the womb, these students are disproportionately likely to need (and federal law mandates that they receive) special education services and support, often from pre-kindergarten through the 12th grade. These required services and supports roughly *double* the cost of educating them. And that unfunded expense—directly and

proximately caused by the opioid crisis—is punching holes in public school budgets across the country.

**29.** Plaintiffs are bringing this case against the Defendants named in this complaint because these Defendants catalyzed the opioid crisis in this country—by conspiring with and substantially assisting multiple opioid manufacturers and other opioid industry participants to promote, market, sell, and flood the country with opioids, all the while knowing: (a) that these narcotics were highly addictive, ineffective, and unsafe for the conditions for which they were being marketed (long-term chronic pain, non-acute pain, and non-cancer pain); and (b) that they were often being prescribed to patients who were known to be abusing and diverting them, in violation of statutes and regulations prohibiting their promotion and sale for other than legitimate medical purposes.

**30.** By their conduct, described in this Complaint, Defendants knowingly concealed the risks and exaggerated the benefits of opioids; created and conspired to create a public nuisance; acted negligently, grossly negligently, or with tortious intent; violated or conspired to violate statutes and regulations regulating the sale of controlled substances; and imposed heavy costs on school districts.

## A. The Development, Manufacture, and Marketing of Opioids

**31.** The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain. These receptors play a crucial role in pain sensation. By binding to them, opioids relieve pain.

**32.** Natural opiates derive from the opium poppy plant (which is just one specific species within the larger poppy plant family). Morphine and codeine are the best-known examples

of natural opiates. Chemists first isolated the morphine and codeine alkaloids in the early 1800s. They are narcotics known for their analgesic, meaning pain relieving, effects.

**33.** Opioids are highly addictive. That is largely because: (1) they activate powerful reward centers in the brain; (2) patients rapidly develop tolerance to them, soon requiring progressively higher and higher doses to achieve the same effects; and (3) stopping or reducing use often triggers severe withdrawal symptoms, often lasting for months and producing pain that's worse than before the first dose. Defendants knew these facts, including that opioids are addictive and deadly. They conspired to conceal and deny these facts.

**34.** Because of their high risk of addiction, opioids have been federally regulated since 1914. Today, most opioid regulation is governed by the Controlled Substance Act, which classifies prescription opioids as Schedule II drugs and requires effective controls to prevent their misuse and diversion.

**35.** Pharmaceutical companies have invested heavily in developing prescription opioids that would be safer synthetic substitutes for morphine and codeine, with comparable pain relief but without the same addictive properties. The best-known examples are Vicodin (using the synthetic opioid hydrocodone) and Percodan and Percocet (both using the synthetic oxycodone). To reduce their addictive potential, these synthetic formulations contain relatively low opioid content, and they are mixed with aspirin or acetaminophen. (A typical dose of Percocet might contain 325 mg of acetaminophen and only 5 mg of oxycodone). But that changed in 1996, when Purdue Pharma launched OxyContin—which contains high amounts of oxycodone and neither acetaminophen nor aspirin. The weakest formulation of OxyContin delivers as much narcotic as the strongest Percocet tablet, and some OxyContin tablets deliver sixteen times as much.

**36.** By 2004, OxyContin sales had soared. OxyContin became America's most widely abused prescription drug:




**37.** Working in concert with numerous opioids manufacturers and with McKinsey, the Defendants named in this complaint—Publicis, Practice Fusion, and ZS—helped ignite the worst drug epidemic in U.S. history. They made Purdue's OxyContin the taproot of that crisis. And they accomplished this primarily by developing and deploying four key tactics.

**38.** The first tactic was targeting. Working with McKinsey, Defendants profiled individual physician prescribers, analyzed their prescribing patterns, segmented them into types, and divided them into deciles by how many milligrams of extended-release opioids and how many tablets per prescription they prescribed.

**39.** Defendants' second tactic was saturation "detailing." Sales reps' discretion to set priorities for themselves was eliminated. Again working alongside McKinsey, Defendants organized and trained sales reps to blitz the highest prescribing ("targeted") prescribers (or their

nurses or physician assistants)—by visiting them, calling them, and emailing them frequently. They also worked to convert "fence sitters" into loyal OxyContin prescribers.

**40.** McKinsey reported to Purdue that "the average prescriber in decile 5-10 [the top half of prescribers by volume] writes 25 times as many OxyContin scripts as a prescriber in decile 0-4 …" and "Given that there are 14,000 uncalled physicians in deciles 5-10, there is significant opportunity to shift calls to higher potential subscribers," who McKinsey also found, were most influenced by "detail" visits.

**41.** Through Defendants' "detailing," sales calls rose fivefold in strategically chosen areas:




Tennessee AG's Office

From 2000 to 2015, and largely because of increased "detailing," Purdue's spending on marketing—on what Publicis, Practice Fusion, and ZS were doing—surged from $5 million to $45 million per quarter, an increase of 800%:




**42.** Defendants' third tactic was persuasion through deception. In conjunction with Purdue and McKinsey, as well as other opioid manufacturer clients, Publicis, Practice Fusion, and ZS set out to downplay the risks of addiction, normalize opioid use, and push doctors by messaging—falsely—that opioids were safe, non-addictive when used as directed, "abuse deterrent," and effective and appropriate not only for short-term pain but also for long-term chronic pain, non-acute pain, and non-cancer pain:




**43.** Defendants' fourth tactic was "titration": through saturation detailing, defendants induced targeted physicians to adjust ("titrate") existing patients' opioid prescriptions. The goal of the adjustment was always upward. To encourage titration, Publicis created patient "vignettes"—bragging about its "profound power" to influence providers and patients, not with "medically-vetted, clinical information" that might "interrupt the important connection forged by narrative" but with a "well told story" that would "trigger a dopamine release." https://www.publicishealthmedia.com/perspective/improving-outcomes-through-health-narratives/. In none of these "vignettes" did a patient ever titrate *down.* The "well told story" that Publicis pushed on physicians was always about patients titrating *up.* This titrating tactic was highly successful. "The well told story" induced doctors to prescribe higher strength tablets:




By 2017, over half of all prescriptions for opioids manufactured by Purdue exceeded the CDC's recommended maximal dose. Defendants' efforts both at increasing sales and increasing doses was highly effective.

**44.** Defendants' four tactics served one overarching strategy: to hook more patients on opioids for ever-longer periods and for an ever-widening range of conditions, in order to sell more total milligrams of pills, generating more revenue. Through Defendants' efforts, Purdue tripled OxyContin sales, dominated by high dosage sales, flooding communities with pills, and igniting a nationwide epidemic.

**45.** Data confirm that Defendants' sales and marketing tactics drove increased sales. Particularly striking evidence of this causation (and not merely correlation) emerges from a natural experiment arising from Purdue's marketing decisions. When Purdue launched Oxycontin in 1996,

five states had "triplicate" prescription programs that required prescribers of Schedule II drugs to fill out each prescription in triplicate and submit one copy to a state agency for monitoring. Because these "triplicate" requirements created a barrier to sales, Purdue largely opted not to market in those states—creating a quasi-experimental opportunity. By comparing sales in states with and without triplicate requirements (and, therefore, with and without Oxycontin marketing), researchers found that forgoing marketing made a huge difference. Oxycontin distribution was roughly 50% lower in triplicate states (states without marketing)—and so were overdose deaths. A JAMA study confirmed the same pattern: counties targeted with more opioid marketing had higher prescribing rates and more overdose deaths. Defendants' marketing campaigns did not merely coincide with the opioid crisis; they actively contributed to it.

**46.** The role of Defendants' tactics in catalyzing today's opioid crisis with their marketing campaigns has been succinctly captured by Professor Amanda Pustilnik. She was formerly a management consultant for one of the coconspirators here, McKinsey & Company. Now, she is affiliated with the Center for Law, Brain, & Behavior at Harvard Medical School and Massachusetts General Hospital. "[T]he story of the opioid epidemic," she explains, "is often misrepresented as a story of irresponsible patients and over-prescribing doctors." But that account, she emphasizes, is false. "Patients and doctors were not, on average, irresponsible," she says. They "acted under the influence of a concerted plan of misinformation and over-promotion … for these medications."[1]

[1] Thomas F. Harrison, "Novel Opioid Lawsuit Goes After Ad Agency," Courthouse News, May 6, 2021, *available at:* https://www.courthousenews.com/novel-opioid-lawsuit-goes-after-ad-agency/.

**B. Publicis' Role in Catalyzing the Opioid Crisis**

**47.** Like McKinsey and like the other Defendants here, Publicis played pivotal roles in the marketing of both branded and unbranded opioid products for multiple opioid manufacturers, furthering the conspiracy's goal of "turbocharging" the overall market for opioids and not just for any particular manufacturer's particular branded opioid.

**48.** At Endo, Publicis' Saatchi & Saatchi unit was the agency of record ("AOR") for Opana, Endo's branded oxymorphone product. Opana was a rebranded version of Numorphan, which Endo had previously been forced to remove from the market in 1979 due to abuse and diversion issues.

**49.** At Teva, Publicis' Verilogue unit assisted with marketing efforts for Fentora, a branded fentanyl product Teva acquired with its acquisition of Cephalon, Inc. Meanwhile, Publicis' Rosetta unit handled interactive marketing for the Fentora brand, and Publicis' Touchpoint Solutions unit analyzed prescriber behavior to determine which prescribers were and were not prescribing Fentora. Eventually, Publicis Touchpoint Solutions was utilized as a contract sales organization to detail Fentora prescribers.

**50.** At Johnson & Johnson/Janssen, Publicis' Arista unit served as a contract sales force to market Janssen's branded tapentadol product, Nucynta. Publicis' Verilogue and Razorfish units also contributed to marketing efforts for the drug.

**51.** Additionally, from 2010 until 2019, Publicis was Purdue's principal marketing partner—its AOR for a number of Purdue's branded opioid products, including OxyContin. As Purdue's AOR, Publicis often oversaw even projects assigned to other agencies. Publicis also identified distribution channels through which marketing messages would be disseminated to

prescribers (by Practice Fusion) and to the general public (through efforts like "Partners Against Pain" and websites like TeamAgainstOpioidAbuse.com).

**52.** Publicis' work spanned multiple aspects of Purdue's marketing and sales operations. Publicis described itself internally as the "strategic backbone" of Purdue's marketing efforts and McKinsey's "Project Turbocharge." Publicis was charged with maximizing the reach and influence of Purdue's sales force; leveraging electronic media; designing and developing content; drafting scripts and other materials for Purdue sales representatives to use with prescribers; helping with internal operations; targeting prescribers likely to prescribe large amounts of opioids; recording intimate discussions between prescribers and patients about opioids; and many other marketing, consulting, and sales activities.

**53.** Working hand in hand with McKinsey on "Project Turbocharge," Publicis persuaded Purdue to massively increase the number of sales calls to targeted prescribers—on the theory, confirmed by data, that "detailing" physicians' offices increases sales. As a key component of Project Turbocharge, Publicis purveyed disinformation that opioids were safe, nonaddictive, and "abuse deterrent." (Eventually, the name "Project Turbocharge" was deemed too sensational and switched to project "Evolve to Excellence" (or "E2E")).

**54.** Publicis also designed "Conditions Campaigns" to influence prescribers to prescribe opioids as treatment for more and more "off label" conditions, including low back, cancer, and osteoarthritis pain, ignoring that Oxycontin was neither indicated nor safe for those conditions.

**55.** Publicis was also enlisted to review the draft "target" lists of healthcare providers that McKinsey and ZS Associates prepared for Purdue. Publicis also helped Purdue deploy key opinion leaders and front groups (like Partners Against Pain) to spread disinformation about how

opioids were supposedly safe and less addictive—and to promote pain as a "fifth vital sign," along with pulse, blood pressure, temperature, and respiration rate.

**56.** Always, and relentlessly, Project Turbocharge (or "E2E") was about selling more and more total milligrams of Oxycontin. Publicis understood very well the crisis that "Project Turbocharge" was igniting—including, as Publicis employees themselves put it, that once a patient is prescribed an extended release Oxycontin, "discontinuation is usually an irrelevant subject matter …. Once on an ERO, the only way is up," leading to overdosing and addiction.

**57.** In its own description of its "strategic imperatives" for OxyContin in 2015, Publicis explicitly prioritized "increasing conversions," "growing volume," and "driving" "titration" above "reduc[ing] abuse, diversion and overdose":

## 2015 OxyContin Strategic Imperatives

*Updated 7/10*

| Opportunity/Issue | Objective | Strategy |
|---|---|---|
| • No IROs have ADPs<br>• Likely national up-scheduling of hydrocodone<br>• Segmented messaging with a promotionally-sensitive brand<br>• Little approvable branded messaging to drive IRO-to-ERO conversion<br>• Continued declining mean patient dose<br>• Patient understanding of chronic pain management | Grow volume/ slow erosion | Increase conversions from oxycodone IROs by educating HCPs on how to identify appropriate patients<br><br>Drive appropriate titration through ongoing reassessments and patient education |
| • Increasing pressure to reduce abuse, diversion and overdose<br>• Limited prescriber understanding of current OxyContin ADP evidence<br>• Potential Tier 4 approval<br>• Potential approval of new ER oxycodones with ADPs<br>• OxyContin has 7 tablet strengths<br>• Continued pharmacist role in opioid Rx vetting | Increase choice of OxyContin as 1st branded ERO through meaningful differentiation | Increase awareness, understanding and relevance of OxyContin abuse deterrent properties to drive preference vs. all other opioids<br><br>Maintain payer coverage; maximize pull-through opportunities and patient affordability |

7

Produced as native document PUBLICIS-0129308

**58.** Publicis was aware of clear evidence of mounting harms—overdoses, deaths, and "diversion." ("Diversion" is redirecting prescription medications into illegal or unauthorized uses).

But despite that evidence, Publicis repeatedly doubled down, focusing on influencing doctors to prescribe more opioids to more patients for more conditions, ignoring the foreseeable and inevitable consequences of more widespread opioid use disorders, overdosing, diversions, and deaths.

**59.** In June 2014, in the course of reviewing a presentation regarding OxyContin, a Publicis employee struck out language referring to prescribing the "lowest possible dose"—because that language was contrary to Project Turbocharge, which emphasized titrating to higher and higher doses and lengthening therapy to maximize revenue.

**60.** In May 2015, Publicis staff members Christina Ceniza, Linda Ketchum-Pompili, and Bruce Rinderman had an extraordinary exchange. They were working on designing marketing messages claiming that Purdue's new crush-resistant formulation of OxyContin reduced opioid use disorder. In the midst of that work, Rinderman wrote to Ceniza attaching the results from a National Survey on Drug Use and Health showing that the new formulation wasn't reducing opioid use disorders. Ceniza replied: "Ugh—no, you're right." Yet undeterred, Publicis continued to create messaging for OxyContin that billed it as "abuse deterrent": "OxyContin is the only opioid that addresses the pain management needs of both patients (efficacy and dosing flexibility) and society (proven abuse deterrent properties)."

**61.** Stunningly, in 2016, briefly unsettled by the facts, Publicis prepared an alternative strategy for Purdue. Publicis proposed "get[ing] every patient off Purdue's medications" and "fully embrac[ing]" "responsibility" for "keeping people safe":




This temporary moment of conscience quickly passed. Publicis soon resumed developing and overseeing strategies to boost opioid sales for Purdue and for other opioid-manufacturer clients.

### C. Practice Fusion's Role in Catalyzing the Opioid Crisis

**62.** Starting in 2012, Publicis urged Purdue to place banner ads in front of prescribers as they were meeting with patients. This could be accomplished, Publicis explained, by inserting ads into the patients' electronic health records (EHRs), using software designed for that purpose by Practice Fusion. Publicis encouraged and facilitated Practice Fusion's partnership with Purdue. Practice Fusion was recruited to Project Turbocharge by Publicis.

**63.** Practice Fusion's software was used by approximately 30,000 medical practices serving 5 million nationwide. And Publicis advised Purdue that Practice Fusion's system would camouflage the banner ads to look not like promotions but like "alerts" or "clinical decision support," strategically timed to appear on doctors' screens "at the point of prescription"—for

example, while a provider was entering information about a patient's pain symptoms—precisely when treatment decisions are being made.

**64.** From at least 2016 through at least the spring of 2019, acting on Publicis's suggestion, Purdue engaged Practice Fusion to embed these alerts in patients' EHRs.

**65.** Publicis paid Practice Fusion's invoices on behalf of Purdue.

**66.** In developing alerts for Purdue, Practice Fusion was aware of the CDC's guidelines for prescribing opioids—for example, that extended-release opioids "should be reserved for severe, continuous pain," that "nonpharmacologic therapy and nonopioids pharmacologic therapy are preferred for chronic pain," and that "there is no good evidence that opioids improve pain or function with long-term use." But Practice Fusion did not incorporate any of those recommendations into its alerts. The alerts deviated from the CDC's guidelines, including by listing extended-release opioids as a treatment option on equal footing with immediate-release opioids and non-opioid therapy.

**67.** Purdue, Publicis, and Practice Fusion all understood that the purpose of the "alerts" was to induce doctors to write more opioid prescriptions, for more patients, at higher doses. They also all knew that the foreseeable consequence—in addition to increased revenue—would be more opioid use disorders, overdoses, and deaths.

**68.** By implementing the alerts, which Publicis and Purdue's marketing staff also helped to develop, Practice Fusion estimated that Purdue would gain 2,777 patients and generate between $8,458,232 and $11,277,643 of additional revenue. And the alerts worked: physicians receiving them wrote opioid prescriptions at a higher rate than those who did not. The alerts reached prescribers more than 230 million times between 2016 and 2019.

### D. ZS Associates' Role in Catalyzing the Opioid Crisis

**69.** ZS is a global management consulting and professional services firm, specializing in sales, marketing, and analytics, especially for clients in the pharmaceutical, biotechnology, and healthcare industries. ZS claims "pharma domain expertise." ZS has worked for most of the largest manufacturers of opioids, including Purdue, Endo, Mallinckrodt, Teva, and Janssen / Johnson & Johnson.

**70.** ZS is particularly known for sales force optimization. Sales forces are a major component of pharmaceutical companies' operations. In his 2015 deposition testimony, Purdue's Dr. Richard Sackler agreed that "the main way [Purdue] marketed and promoted its OxyContin was with [Purdue's] salesforce."

**71.** For all of its opioid pharmaceutical clients, ZS's main role has been to advise them about how to optimize, incentivize, and deploy sales reps to maximize revenue from opioid sales. This has included crafting incentive compensation structures and assigning territories for sales representatives nationwide, identifying "target" prescribers, categorizing the targets, testing and recommending sales pitches (to examine, for example, whether it's more persuasive to emphasize how quickly an opioid relieves pain or for how long it relieves pain), and defining and measuring results (usually by return on investment, or "ROI").

**72.** ZS worked for Purdue from 2008 until at least 2018, implementing Project Turbocharge, including by collaborating with McKinsey to: consider "critical questions about sales force design"; analyze "decile physicians based on Market TRx [total prescriptions]"; compile "target" lists of a physicians "most likely to drive and maintain growth"; determine the optimal level of resources to devote to OxyContin as compared to another Purdue opioid product (Butrans); and expand OxyContin sales and Purdue's overall portfolio. McKinsey and ZS

employees met, discussed, and worked on these goals together. ZS's work was so important to Project Turbocharge that McKinsey impressed on Purdue that "it's pretty important that ZS have the details otherwise Purdue can't really achieve the value of *our* [McKinsey's] effort."

**73.** Like McKinsey and Publicis, ZS also worked with virtually every other large opioid manufacturer.

**74.** ZS helped Mallinckrodt launch two branded opioid drugs (Exalgo and Xartemis XR) and develop two more opioid drugs known by internal code names as Ruby and Zircon.

**75.** Consistent with ZS's design of Mallinckrodt's sales force incentive compensation plan, Mallinckrodt urged its sales representatives to "ATTACK" health care providers and told them that they could obtain "big bonus dollars" by waiting in front of doors of health care providers and using free trial offers to gain prescriptions. Another sales supervisor encouraged sales representatives that Xartemis "is the BEST opportunity to make lots of money!!!."

**76.** ZS also worked for Endo, helping that company increase sales of its opioid drug Opana. ZS designed incentive compensation schemes for the Opana sales representatives. And in a presentation to Endo, ZS bragged that, for opioid sales in particular, "[s]ales force detailing"—sending pharmaceutical sales reps to direct market the drugs to prescribers—"is the most impactful tactic," accounting for roughly "35–65% of all sales …."

**77.** ZS worked for Teva, to help sell the opioid drug Fentora.

**78.** ZS worked for Janssen / Johnson & Johnson, to help sell Nucynta and Duragesic, a fentanyl patch traditionally sold to cancer patients experiencing breakthrough cancer pain. One of ZS's contributions regarding Duragesic was to encourage and induce off-label prescribing of Duragesic for back pain, fibromyalgia, arthritis, and neuropathic pain.

## E. Teamwork

**79.** For Purdue—the most influential manufacturer of opioids because of its aggressive marketing of OxyContin—the contributions of McKinsey, Publicis, Practice Fusion, and ZS Associates were concerted and mutually reinforcing.

**80.** Purdue and McKinsey guided overall strategy, including implementing Project Turbocharge, targeting high-volume prescribing physicians, and disseminating disinformation about opioids' risks. Publicis, Practice Fusion, and ZS executed these strategies. Publicis designed marketing campaigns for distribution through channels such as Practice Fusions' "alerts," ensuring that prescribers received reminders at the precise moment treatment decisions were made. ZS structured, incentivized, and trained the sales force.

**81.** Every step these conspirators took to advance Project Turbocharge—from detailing to targeted sales pitches to off-label "Conditions Campaigns" to "alerts" —was carefully calibrated and part of a common plan: to induce more doctors to prescribe more opioids, at higher doses, for more conditions, and to keep patients on them for longer. And every coconspirator understood and agreed to that goal: to maximize revenue, despite the foreseeably inevitable consequences of widespread opioid use disorders, addiction, overdoses, and deaths.

**82.** With meticulous attention, Defendants jointly, consistently, and knowingly manipulated prescriber behavior, misled doctors and patients, and circumvented CDC, FDA, and DOJ safeguards. At every turn, they prioritized profits over safety.

**83.** Publicis and ZS worked for multiple opioid manufacturers, giving them a panoptic view of the opioid market. Like McKinsey, they likely knew more about abuse, diversion, and the harmful and unlawful consequences of their strategies than any of the individual manufacturers.

**84.** All Defendants here acted with full knowledge that mass marketing opioids was causing overdoses and deaths and that they were promoting opioids to physicians who were knowingly prescribing them to patients who were abusing and diverting them.

**85.** On June 11, 2014, while Publicis was working to implement Project Turbocharge, Publicis' John Dwyer was informed that the DEA believed "an oversupply of painkillers is fueling

the black market for both prescription opioids and heroin" and that 668 individuals in the State of Massachusetts alone had died of opioid overdoses in a single year (2012). In an internal Publicis email, Dwyer acknowledged that "in the opioid market there are so many other factors to consider than just 'how can we increase sales of our product?'"

**86.** Practice Fusion likewise knew that its work for Purdue was not intended to provide prescribers with accurate information about the characteristics and risks of Purdue's products. In September 2015, one Practice Fusion employee stated in an internal email that, for Purdue, "this was all about marketing."

**87.** In 2018, McKinsey, with whom all Defendants here conspired, published a report titled "Ten insights on the US opioid crisis from claims data analysis," revealing what was undeniable as they advised opioid manufacturer clients about how to sell more opioids, at higher doses, to the highest-volume prescribers:

a. "Providers frequently prescribe opioids to patients with known or potential risk factors for abuse;" and

b. "Approximately 35% of the patients given opioid prescriptions in our analysis had features that put them at increased risk for opioid abuse."

https://www.mckinsey.com/industries/healthcare/our-insights/ten-insights-on-the-us-opioid-crisis-from-claims-data-analysis. Two years earlier, in 2016, the New England Journal of Medicine had published an article similarly stating that: "[*T*]*wo major facts can no longer questioned*. First, opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions …. *Second, the major source of diverted opioids is physician prescriptions*." https://www.nejm.org/doi/full/10.1056/NEJMra1507771 (emphasis added). All Defendants here knew these facts.

## V. ACCOUNTABILITY

**88.** In 2007, **Purdue** entered a guilty plea for felony misbranding for misrepresenting that Oxycontin was less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications. As part of the resolving criminal charges, Purdue also signed a Corporate Integrity Agreement (CIA) restricting its opioid sales practices. https://www.vawd.uscourts.gov/opinions/jones/107cr00029.pdf.

**89.** In 2015, **Purdue** agreed to a settlement with the State of Kentucky for improper marketing of OxyContin and other products. **ZS** and **Publicis** were involved in that improper marketing. https://www.ag.ky.gov/pdf_news/purduepharmaoxycontin.pdf.

**90.** On March 3, 2016, the New York Attorney General announced a settlement with **Endo** regarding the misleading marketing of its opioid drug Opana. **ZS** and **Publicis** had been substantially responsible for marketing Opana for Endo. "Numerous New York health care providers who were heavily 'detailed' by Endo (i.e., by Endo sales reps deployed pursuant to ZS's methodologies) were convicted of illegal prescribing of prescription opioids," explained the New York Attorney General. https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-settlement-endo-health-solutions-inc-endo.

**91.** On July 11, 2017, another conspirator and **ZS** client, **Mallinckrodt**, settled claims by the DOJ that the company had violated provisions of the Controlled Substances Act by not meeting its obligations to detect and notify DEA of excessive sales orders of oxycodone. https://www.justice.gov/archives/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders.

**92.** On January 27, 2020, **Practice Fusion** entered into a Deferred Prosecution Agreement with the United States Attorney's Office for the District of Vermont. As part of that

agreement, Practice Fusion stipulated that it had engaged in an illegal conspiracy to boost sales of OxyContin by designing "alerts"—i.e., the ones described in this Complaint—that would "cause healthcare providers to extend the duration of ERO [extended release opioid] prescriptions, convert patients receiving IROs [immediate release opioids] to EROS, and to increase the overall market of ERO-using patients." *United States v. Practice Fusion, Inc.*, No. 2:20-cr-00011-wks, ECF 2-4. The U.S. Attorney responsible for investigating Practice Fusion called the company's conduct "abhorrent," stating:

> During the height of the opioid crisis, the company took a million-dollar kickback to allow an opioid company to inject itself in the sacred doctor-patient relationship so that it could peddle even more of its highly addictive and dangerous opioids. The company illegally conspired to allow [Purdue] to have its thumb on the scale at precisely the moment a doctor was making incredibly … important decisions about a patient's medical care, including … pain medication and prescription amounts."

DOJ Press Release, https://www.justice.gov/archives/opa/pr/electronic-health-records-vendor-pay-145-million-resolve-criminal-and-civil-investigations-0.

**93.** On November 24, 2020, Purdue pled guilty again, this time to felony charges of conspiring to improperly market Oxycontin and other opioids. Purdue admitted that from May 2007 through at least March 2017, it had facilitated the dispensing of opioid products, including OxyContin, without a legitimate medical purpose, and had made illegal payments to Practice Fusion in exchange for referring, recommending, and arranging for physicians to prescribe Purdue's extended-release opioid products. The felony charges concerned the adoption and implementation of McKinsey's Project Turbocharge in 2013 and thereafter, specifically. https://www.justice.gov/archives/opa/pr/opioid-manufacturer-purdue-pharma-pleads-guilty-fraud-and-kickback-conspiracies. ZS and Publicis were significant participants in the conduct to which Purdue pled guilty to in 2020.

**94.** On February 4, 2021, forty-nine state attorneys general announced a multistate settlement with **McKinsey** related to its role, both for Purdue and other opioid manufacturers, in the conspiracy alleged in this complaint: for focusing sales calls on high-volume prescribers; using specific messaging to get physicians to titrate more patients to higher dose prescriptions; and circumventing pharmacy restrictions, all of which helped cause and contributed to rises in opioid abuse, dependence, addiction, and overdose deaths. https://illinoisattorneygeneral.gov/dA/e2ac8393ab/202102-04%20573%20MILLION%20SETTLEMENT%20WITH%20MCKINSEY%20and%20COMPANY%20OVER%20ROLE%20IN%20OPIOID%20EPIDEMIC.pdf.

**95.** In February 2024, **Publicis** entered into a national settlement with a coalition of state attorneys general for $350 million for its role in the conspiracy alleged in this Complaint—for having worked alongside McKinsey and Practice Fusion to push false, deceptive, and predatory strategies to increase Purdue's opioid sales, including promoting OxyContin as safe and unable to be abused, knowing that claim was not true. https://illinoisattorneygeneral.gov/news/story/attorney-general-raoul-reaches-settlement-with-multinational-marketing-firm-for-role-in-opioid-epidemic.

**96.** In December 2024, **McKinsey** resolved criminal and civil investigations by the United States Department of Justice regarding its work on Project Turbocharge, specifically, and its broader work for opioids manufacturers beyond Purdue. McKinsey agreed to pay $650 million. https://www.justice.gov/archives/opa/pr/justice-department-announces-resolution-criminal-and-civil-investigations-mckinsey-companys. Concurrently, **McKinsey** partner Martin Elling pled guilty to obstruction of justice regarding his destruction of documents relating to McKinsey's work

with Purdue. He was sentenced to six months imprisonment on May 22, 2025. https://www.justice.gov/usao-wdva/pr/former-senior-partner-mckinsey-company-sentenced.

## VI. DEFENDANTS' CONDUCT TOLLING THE STATUTE OF LIMITATIONS

### A. Fraudulent Concealment

**97.** Defendants engaged in active efforts to deceive and fraudulently assure the public, including Plaintiffs, that opioids were non-addictive, effective, and safe for treating long-term chronic pain and non-acute, non-cancer pain. Defendants' efforts led to overprescribing and suspicious sales of opioids, causing and contributing to the opioid crisis. Without reliable scientific evidence to support their claims, Defendants deliberately implemented marketing strategies and tactics to deceptively represent opioid products as non-addictive, safe, and effective.

**98.** Defendants, however, actively concealed their roles in their clients' deceptive marketing.

**99.** Before the applicable limitations period, Plaintiffs did not suspect—and had no reason to suspect—Defendants' role in marketing opioids or that Defendants' conduct had injured them. Plaintiffs did not discover the nature, scope, or magnitude of Defendants' misconduct, and its impact on them, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**100.** Defendants' fraudulent concealment has tolled the running of any statute of limitations.

### B. Equitable Tolling

**101.** With Defendants' guidance and advice, Purdue and other opioid manufacturers publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of opioids and curb the opioid epidemic. They made broad promises to change

their ways, insisting they were good corporate citizens. But in reality, with Defendants' assistance and through repeated misrepresentations, opioid manufacturers misled regulators, prescribers, and the public, including Plaintiffs.

**102.** Defendants intended that their actions and omissions would be relied upon, including by Plaintiffs, and their actions and omissions deprived Plaintiffs of actual or implied knowledge of facts sufficient to put them on notice of potential claims.

**103.** Plaintiffs did not know and did not have the means to know the truth due to Defendants' and their clients' actions and omissions. Plaintiffs reasonably relied on the affirmative false statements developed by Defendants and made by Defendants' clients regarding their purported compliance with their obligations under the law and consent orders.

**104.** In addition, Defendants provided their services to their opioid manufacturers confidentially. They concealed the content of their services—including their roles in shaping, editing, and providing false and misleading materials to regulators, prescribers about opioids and pain management—both from the public at large and from Plaintiffs, thus also concealing the existence of grounds for claims against them.

**105.** Defendants are, therefore, also equitably stopped from relying on any statute of limitations defense.

### C. No Lapse of Time Can Legalize a Continuing Public Nuisance, for which There is No Statute of Limitations.

**106.** The public nuisance that is the opioids crisis remains ongoing and unabated.

**107.** In addition, the common-law rule *quod nullum tempus occurrit regi*—time does not run against the king—applies. Statutes of limitation that do not explicitly refer to the government do not operate against it. See generally, *Guaranty Tr. Co. of New York v. United States*, 304 U.S. 126, 132

(1938) (noting that "acceptance" of this common-law rule is "so complete" that it "has been universally deemed" to grant the government an exemption from limitations periods).

## VII. SCHOOL DISTRICT INJURIES

**108.** Defendants' intentional and/or unlawful conduct, described in this Complaint, has caused Plaintiffs and the State Classes direct and foreseeable and past and continuing economic damages, including: (1) the costs of providing special education and related services and supports to students with opioid-related learning disabilities and students needing psychological counseling or other supports to help them manage and respond to situations caused by family members' opioid use disorders or opioid-related traumas (including opioid overdoses and deaths); (2) the cost of increasing school security in response to the opioid crisis; (3) the costs of providing medical care, additional therapeutic services, and prescription drug purchases to treat students themselves suffering from opioid use disorders; (4) increased costs for disability payments for district employees with opioid use disorders; and (5) loss of tax revenue. Plaintiffs also seek funds for measures to abate the epidemic.

**109.** Students exposed to opioids before birth are significantly more likely to need special education services. They are more likely to have developmental delays, speech or language impairments, intellectual disabilities, autism spectrum disorders, or Attention Deficit Disorders. They are more likely to fail to meet grade-level norms. These differences, individually and in combination, make them significantly and disproportionately more likely to qualify for and receive mandated special education services, which roughly double the cost of educating them.[2]

---

[2] Chasnoff, IJ, Seiger ML (2023), *Prenatal Opioid Exposure and Special Education Needs: A Sibling Study*, Adv Pediatr Res. 10:069; *see also* Mary-Margaret A. Fill et al., *Educational Disabilities Among Children Born With Neonatal Abstinence Syndrome*, 142 Pediatrics e20180562 (2018); Oei JL, Mulhuish E, Uebel H, et al., *Neonatal Abstinence Syndrome and High School Performance*, 139 Pediatrics 2 (2017); Sirnes, Eivind, et al., "Brain morphology in school-aged children with prenatal opioid exposure: a structural MRI study," *Early Human Development* 106 (2017), 33-39.

## VIII. CLASS ALLEGATIONS

**110.** Plaintiffs bring this case on behalf of themselves and seven separate statewide classes of independent school districts. Within each class, all class members are citizens of the same state. The seven classes are defined as follows:

> **Maryland Class:** All independent public school districts in the State of Maryland. (City Schools is the class representative for this class).
>
> **New Mexico Class:** All independent public school districts in the State of New Mexico (Eunice and Gallup McKinley are the class representatives for this class).
>
> **California Class:** All independent public school districts in the State of California (Lassen County and Susanville are the class representatives for this class).
>
> **Maine Class:** All independent public school districts in the State of Maine (RSU 34 Portland are the class representatives for this class).
>
> **Florida Class:** All independent public school districts in the State of Florida (Putnam is the class representative for this class).
>
> **Tennessee Class:** All independent public school districts in the State of Tennessee (Hamblen is the class representative for this class).
>
> **West Virginia Class:** All independent public school districts in the State of Virginia (Mason, Marion, Wyoming are the class representatives for this class).

**111.** Plaintiffs may move to amend or modify these class definitions, further divide them into subclasses, or limit class certification to particular issues as facts develop or circumstances require.

**112.** All members of each of the State Classes are incurring steadily rising costs to provide required special education and related supports and services to, and to divert resources to

meet the needs of: (a) children exposed to opioids *in utero,* who, as a result, are approximately twice as likely to experience learning and developmental disabilities and, therefore, require costly and federally mandated special education services and supports that roughly double the cost of educating them;[3] and (b) children who exhibit emotional and behavioral challenges in school due to family members' opioid disorders.

**113.** As current and future cohorts of opioid-impacted children continue to enter school and move through the public school system—from elementary school (or pre-kindergarten) through high school—many will require special education services and supports throughout. As a direct and foreseeable result of the opioid crisis that Defendants caused and contributed to, Plaintiffs and all members of the State Classes will continue to incur substantial and escalating costs.

**114.** **Numerosity**. The potential members of the State Classes as defined as so numerous that joinder of all members is unfeasible and not practicable. There are 24 independent public school districts in Maryland, 111 in New Mexico, 937 in California, 263 in Maine, 73 in Florida, 141 in Tennessee, and 55 in West Virginia.

**115.** **Commonality and Predominance**. There are questions of law and fact common to the State Classes, which predominate over any questions affecting only individual State Class members. These common questions of law and fact include, among others:

a. Whether Defendants' conduct in creating, recommending, and implementing nationwide opioid sales strategies for opioid manufacturers caused or contributed to an increase in opioid addiction and abuse and the effects alleged in this complaint;

b. Whether Defendants' conduct in creating, recommending, and implementing nationwide opioid sales strategies for opioid manufacturers was negligent, grossly

[3] Paul Morgan and Yangyang Wang, *The Opioid Epidemic, Neonatal Abstinence Syndrome, and Estimated Costs for Special Education Services*, 25 American Journal of Managed Care 13 (2019).

negligent, reckless, or intentional;

c. Whether Defendants' conduct caused or contributed to a public nuisance;

d. Whether Defendants' conduct caused an increase in the number of children exposed to opioids *in utero;* and

e. Whether exposure to opioids *in utero* causes children, or disproportionately causes children, to need special education services and other supports in public schools.

**116.** **Typicality.** The named Plaintiffs' claims are typical of the claims of the schools in each of their State Classes. Plaintiffs and all members of all State Classes bring the same claims, arising from the same conduct by Defendants, seeking the same forms of relief.

**117.** **Adequacy of Representation**. Plaintiffs will fairly and adequately represent and protect the interests of the members of their State Class. Counsel representing Plaintiffs are competent and experienced in litigation class actions.

**118.** **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joining all the members of the State Classes is impracticable; the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting judgments; and a class action would provide the best vehicle for resolving the issues similarly affected and situated injured parties. There will be no difficulty in the management of this action as a class action.

## IX. CAUSES OF ACTION

**COUNT I: Common Law Public Nuisance**

**119.** Plaintiffs re-allege and incorporate the allegations set forth above.

**120.** Through their work in marketing, promoting, distributing, and selling massive amounts of opioids throughout the states where Plaintiffs and members of the State Classes are located, Defendants have created a foreseeable, ongoing, substantial. unlawful, and unreasonable

interference with rights common to the public, including to the public health, welfare, safety, peace, comfort, and convenience of the Plaintiffs' and their State Classes' communities, and fueled an opioid epidemic in their communities.

**121.** By their conduct, Defendants have knowingly exacerbated an opioid epidemic that affects entire communities, municipalities, towns, school districts, and states, including Plaintiffs' and their State Classes' communities. Defendants knew, or reasonably should have known, that opioids would be used, possessed, and/or diverted unlawfully nationwide, including in and around Plaintiffs' and their State Classes' school district communities.

**122.** Defendants' nuisance-creating conduct has been intentional and unreasonable and/or violated statutes imposing specific legal requirements for the protection of others.

**123.** As a direct and proximate result of Defendants' intentional, unreasonable, and unlawful conduct with their opioid manufacturer clients, the Plaintiffs and their State Classes have suffered damages, distinct from the personal injuries suffered by their students and including, but not limited to: (a) expenditures to provide special education and other supports and services because of learning disabilities after students' damaging exposure to opioids in utero; and (b) direct costs to Plaintiff and their State Classes to provide health care, disability benefits, and workers' compensation to their employees.

**124.** Unless abated, Defendants' conduct will continue to threaten the health, safety, and welfare of Plaintiffs and other Class Members' students and staff and taxpayers. The Plaintiffs and their State Classes have a clearly ascertainable right to abate this nuisance and its effects and seek relief from it.

**COUNT II: Negligence**

**125.** Plaintiffs re-allege and incorporate all allegations set forth above.

**126.** Purdue's Corporate Integrity Agreement (CIA) with the Government (2007) imposed duties on "all contractors, subcontractors, agents, and other persons who perform sales, marketing, [or] promotional pricing … on behalf of Purdue" to sell, market and promote Purdue products in compliance with all applicable FDA requirements, including requirements that sales, marketing, and promotional materials, including training materials, must be fair and adequate. Such materials, prepared by Defendants for Purdue and other opioid-manufacturer clients, were not fair and adequate regarding off-label uses, withdrawal, drug tolerance, drug addiction, or drug abuse.

**127.** All Defendants were "Covered Persons" under Purdue's CIA.

**128.** By minimizing opioids' risks and exaggerating their benefits, by their negligence (or worse) in devising strategies to maximize opioid sales and encourage over-prescribing of opioids, and by failing to provide complete and accurate warnings of opioids' risks, Defendants violated duties imposed on them as "Covered Persons" under Purdue's CIA and were per se negligent in their violation of state and federal laws, including 21 C.F.R. § 202(e), 18 U.S.C. § 2, and 21 U.S.C. § 846.

**129.** As a direct, proximate, and foreseeable result of Defendants' breaches of their duties as "Covered Persons" under the CIA and their per se negligence, Plaintiffs and members of the State Classes have been injured.

**130.** Defendants are also liable for the negligence of their co-conspirators, including their opioid manufacturer clients, and for the breaches of duties owed by their opioid manufacturer clients to third parties, including Plaintiffs and members of the State Classes.

**COUNT III: Gross Negligence**

**131.** Plaintiffs re-allege and incorporate all allegations set forth above, including Count II above.

**132.** In engaging in the conduct alleged in this Complaint, Defendants behaved grossly negligently, recklessly, and with conscious indifference to the consequences of their actions.

**133.** As a direct, proximate, and foreseeable result of Defendants' or Defendants' co-conspirator opioid manufacturer clients' grossly negligent or reckless conduct, Plaintiffs and the members of the State Classes have been injured.

**COUNT IV: Civil Conspiracy (Vicarious and Accessory Liability)**

**134.** Plaintiffs re-allege and incorporate the allegations set forth above.

**135.** Defendants conspired—with Purdue, their other opioid clients, and with McKinsey—to create a public nuisance and to use unfair, deceptive, and unconscionably tortious or otherwise illegal means to market and boost the sale of opioids in Plaintiffs' and State Class members' school district communities.

**136.** Defendants' overt acts in furtherance of this conspiracy—the tortious or otherwise illegal means by which they have carried out the conspiracy—have included, but not been limited to:

a. Deceptively minimizing the risks and exaggerating opioids' benefits, including by falsely promoting them as safe, non-addictive, and "abuse deterrent";

b. Failing to provide accurate and complete warnings of the foreseeable risks of harm associated with opioids, including that they are not safe, are addictive, and are not "abuse deterrent";

c. Promoting opioids for uses for which they were not indicated;

d. Encouraging dosing at unsafe levels;

e. Targeting the highest prescribing physicians, knowing or consciously ignoring that those prescribers' patients were engaged in abuse and diversion.

**137.** Implicitly or explicitly, Defendants agreed between and among themselves and/or with their opioid manufacturer clients, including Purdue (and McKinsey), to a tortious or otherwise illegal line of conduct—normalizing opioid use by misleading physicians, patients, and the public about opioids' risks and benefits.

**138.** Defendants' conduct in furtherance of this conspiracy was not mere parallel conduct—as evidenced by, among other things, their communications, collaboration, interdependence, motive, opportunity, and concealment.

**139.** As a direct, proximate, and foreseeable result of Defendants' conspiracy, Plaintiffs and the members of the State Classes have been injured.

**140.** As coconspirators, Defendants are jointly and severally liable, along with their clients and with McKinsey, for the resulting harm to Plaintiffs and members of the State Classes.

**COUNT V: Aiding and Abetting (Vicarious and Accessory Liability)**

**141.** Plaintiffs re-allege and incorporate the allegations set forth above.

**142.** Defendants acted in concert with Purdue and their other opioid manufacturer clients, encouraging or giving them substantial assistance to further both means and ends that they knew to be tortious or otherwise illegal, thereby harming Plaintiffs and the members of the State Classes.

## X. JURY DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, request a jury trial on all issues so triable.

## XI. PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of the State Classes they seek to represent, respectfully ask the Court to:

a. Certify the State Classes as defined above, appointing Plaintiffs as the representatives of those State Classes, and appointing their counsel as Class Counsel;

b. Award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law, including trebling of economic injury;

c. Award of restitution and disgorgement;

d. Award all available equitable relief;

e. Award costs and reasonable litigation expenses and attorneys' fees;

f. Award pre- and post-judgment interest, to the extent allowable;

g. Grant injunctive relief; and

h. Provide all such other and further relief as the Court deems reasonable and just.

DATED: November 5, 2025

Respectfully submitted,

*/s/ Cyrus Mehri*

Cyrus Mehri
Joshua Karsh
MEHRI & SKALET PLLC
2000 K Street, Suite 325
Washington, DC 20006
Phone: (202) 822-5100
Email: cmehri@findjustice.com
Email: jkarsh@findjustice.com

Matthew Browne
BROWNE PELICAN PLLC
7007 Shook Ave.
Dallas, Texas 75214
Phone: (405) 642-9588
Email: mbrowne@brownepelican.com

John Barrett
BAILEY GLASSER LLP
1055 Thomas Jefferson St. NW, Suite 540
Washington, D.C. 20007
Phone: (304) 340-2287
Email: jbarrett@baileyglasser.com

Wayne Hogan
TERRELL HOGAN YEGELWEL, P.A.
233 East Bay St., 8th Floor
Jacksonville, FL 32202
Phone: (904) 722-2228
Email: hogan@terrellhogan.com

Neil Henrichsen
HENRICHSON LAW GROUP PLLC
301 W. Bay Street, Suite 1400
Jacksonville, FL 32202
Phone: (904) 381-8183
Email: nhenrichsen@hslawyers.com

*Attorneys for Plaintiffs*