UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BALTIMORE CITY BOARD OF SCHOOL COMMISSIONERS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>PUBLICIS HEALTH, LLC, PRACTICE FUSION, INC., and ZS ASSOCIATES, INC.,<br><br>Defendants. | No. 24 CV 11435<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

The opioid epidemic caused a spike in children born with Neonatal Opioid Withdrawal Syndrome. Those children are significantly more likely to need federally mandated special education services, a cost that falls on school districts. Plaintiffs are twelve independent school districts seeking to recover some of those costs from three companies that helped manufacturers market opioids: an advertising agency, an electronic health records vendor, and a sales consultancy. This is their second attempt; I dismissed their first complaint because it did not state a claim under the Racketeer Influenced and Corrupt Organizations Act. Plaintiffs filed an amended complaint repleading their state-law claims, seeking to hold defendants liable for a public nuisance or negligently inflicted harm that defendants created, conspired to create, or aided and abetted. As before, the motions to dismiss are fundamentally about whether the downstream effects of the opioid epidemic give the districts claims against these defendants. Because they do not, the motions are granted.

## I. Legal Standards

A motion under Federal Rule of Civil Procedure 12(b)(1) challenges the court's subject-matter jurisdiction may be either facial or factual. A facial challenge argues that the plaintiff has not sufficiently "*alleged* a basis of subject matter jurisdiction." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (emphasis in original) (cleaned up). I accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Id.*

Once jurisdiction has been established, I review a motion to dismiss on the merits under Federal Rule of Civil Procedure 12(b)(6). *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 967 n.1 (7th Cir. 2013). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint need not plead legal theories, and the "counts" into which it is divided are not themselves claims; a claim is the set of facts giving rise to a right to relief, whatever the label or number of theories attached to it. *Johnson v. City of Shelby*, 574 U.S. 10, 11–12 (2014) (per curiam); *Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012).

When analyzing the sufficiency of a complaint, I construe it in the light most favorable to the plaintiffs, accepting all well-pleaded facts as true and drawing all reasonable inferences in their favor. *Atlanta Gas Light Co. v. Navigators Ins. Co.*, 164 F.4th 1038, 1046 (7th Cir. 2026). Rule 8(a) "does not demand detailed factual allegations, but it does require more than mere 'labels and conclusions,' or a 'formulaic recitation of the elements of a cause of action.'" *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 494–95 (7th Cir. 2025) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 555 (2007)). "The complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Id.* at 495 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Put another way, the complaint must "present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

A complaint need not anticipate affirmative defenses such as release, res judicata, or the statute of limitations, so dismissal on those grounds is appropriate only when the plaintiff has pleaded itself out of court—when the complaint, together with matters subject to judicial notice, establishes the defense. *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015); *Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008). An amended complaint ordinarily supersedes the original, but it "does not operate as a judicial *tabula rasa*," and when a plaintiff deletes rather than rebuts allegations that showed its claim to be untimely, the earlier allegations may be considered as evidence of the facts they assert. *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1048 (7th Cir. 2019) (citing *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002)).

## II. Background

Purdue Pharma introduced OxyContin in 1996 and, with the help of the consultancy McKinsey & Company, set out to sell as much of it as possible. [59] ¶¶ 2, 27, 35–37.[1] The strategy had four parts: profiling and "targeting" the physicians who

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the amended complaint, [59]. Where the parties rely on the original complaint for dates and

prescribed the most opioids; "detailing" those physicians with frequent sales visits; persuading physicians, through false messaging, that opioids were safe, non-addictive, and appropriate for long-term and off-label use; and "titrating" existing patients to higher doses. [59] ¶¶ 38–43. The plan worked. Purdue's quarterly marketing spend rose from $5 million to $45 million, OxyContin sales tripled, and by 2017 more than half of prescriptions for Purdue's opioids exceeded the CDC's recommended maximum dose. [59] ¶¶ 41, 43–44.

The defendants here are three of the companies that did that work for Purdue and other manufacturers. [59] ¶¶ 1–2. Publicis Health, an advertising agency, was Purdue's agency of record from 2010 until 2019 and described itself as the "strategic backbone" of McKinsey's "Project Turbocharge." [59] ¶¶ 51–53. Publicis designed "Conditions Campaigns" to promote opioids for off-label conditions, reviewed the target lists McKinsey and ZS Associates prepared, and created patient "vignettes" in which the patient always titrated up. [59] ¶¶ 43, 54–55. The school districts allege that Publicis knew what it was doing: a Publicis employee struck the phrase "lowest possible dose" from a presentation because it was "contrary to Project Turbocharge," [59] ¶ 59; when a colleague circulated survey data showing that Purdue's reformulated OxyContin was not reducing opioid use disorder, another replied "Ugh—no, you're right," and Publicis kept marketing the drug as "abuse deterrent" anyway, [59] ¶ 60; and a 2016 Publicis proposal to "get every patient off Purdue's

---

admissions relevant to the statute of limitations, I cite the corrected version, [8], which differs from the complaint as filed, [1], only in its caption and its list of plaintiffs. The school districts do not object to consideration of the original pleading for that purpose.

medications" was set aside, [59] ¶ 61. Publicis also did opioid work for Endo, Teva, and Janssen. [59] ¶¶ 48–50. In February 2024, Publicis paid $350 million to settle claims by a coalition of state attorneys general arising from this work. [59] ¶ 95.

Practice Fusion sells electronic health records software used by some 30,000 medical practices. [59] ¶ 63. At Publicis's suggestion, Purdue paid Practice Fusion to embed "alerts" in patients' records that appeared on physicians' screens at the point of prescribing. [59] ¶¶ 62–64. The alerts were designed to look like clinical decision support rather than advertising, omitted the CDC's guidance that extended-release opioids should be reserved for severe continuous pain, and reached prescribers more than 230 million times between 2016 and 2019. [59] ¶¶ 63, 66, 68. In January 2020, Practice Fusion entered a deferred prosecution agreement with the United States in which it stipulated that it had conspired with Purdue to design alerts that would "increase the overall market of ERO-using patients," and Purdue later pleaded guilty to paying Practice Fusion kickbacks for that work. [59] ¶¶ 92–93.

ZS Associates is a sales and marketing consultancy known for "sales force optimization." [59] ¶¶ 69–70. For Purdue, Mallinckrodt, Endo, Teva, and Janssen, ZS designed incentive compensation plans, assigned sales territories, identified and ranked target prescribers, and tested sales pitches. [59] ¶¶ 71–78. ZS worked with McKinsey on Project Turbocharge from 2008 until at least 2018; McKinsey told Purdue that "it's pretty important that ZS have the details otherwise Purdue can't really achieve the value of our effort." [59] ¶ 72. Mallinckrodt, using an incentive plan ZS designed, urged its representatives to "ATTACK" prescribers, and ZS told Endo

that "sales force detailing" accounted for "35–65% of all sales." [59] ¶¶ 75–76. The school districts allege that ZS's work for so many manufacturers gave it a "panoptic view" of the market and that it "likely knew more about abuse, diversion, and the harmful and unlawful consequences of their strategies than any of the individual manufacturers." [59] ¶ 83. Unlike Publicis and Practice Fusion, ZS has not entered a settlement with any government or been named in any plea or deferred prosecution agreement.

More opioids meant more addiction; more addiction meant more opioid use in pregnancy; more opioid use during pregnancy meant more infants born with Neonatal Opioid Withdrawal Syndrome; and children with that syndrome are roughly twice as likely to need special education services, which roughly double the cost of educating them. [59] ¶¶ 27–28, 108–109, 112. The school districts seek those costs, along with the costs of counseling students whose family members use opioids, school security, medical care and prescription drugs for students with opioid use disorders, disability payments for employees, and lost tax revenue; they also "seek funds for measures to abate the epidemic." [59] ¶ 108. They sue on behalf of themselves and seven statewide classes of independent public school districts. [59] ¶ 110.

The school districts filed their original complaint on November 5, 2024, and a corrected version six days later. [1]; [8]. That pleading asserted a claim under the Racketeer Influenced and Corrupt Organizations Act and rested federal jurisdiction on that claim. I dismissed the racketeering claim with prejudice because at least three independent decision makers—the physicians who prescribed opioids, the

pharmacists who dispensed them, and the parents who took them while pregnant—stood between defendants' alleged predicate acts and the school districts' costs, and I dismissed the state-law claims without prejudice for want of an independent basis for jurisdiction. [55] at 10–12. Eight weeks later, eight of the original plaintiffs, joined by four new districts from Tennessee and West Virginia, moved for leave to file an amended complaint, [57]; I granted the motion, reopened the case, and set a briefing schedule for the present motions. [58]. The now operative amended complaint was filed on November 5, 2025. [59].

## III. Analysis

### A. Jurisdiction

Publicis argues that the school districts have not adequately invoked the Class Action Fairness Act because the allegation that "the amount in controversy exceeds $5,000,000" is conclusory and because the complaint does not address numerosity. [67] at 16–18. A district court has original jurisdiction over a class action in which the aggregate amount in controversy exceeds $5 million, any member of the plaintiff class is a citizen of a state different from any defendant, and the proposed classes contain at least 100 members in the aggregate. 28 U.S.C. § 1332(d)(2), (d)(5)(B), (d)(6).

The complaint pleads each element. It alleges minimal diversity, which is apparent from the parties' citizenships: the school districts are political subdivisions of seven states, and the defendants are citizens of Delaware, New York, California, and Illinois. [59] ¶¶ 7–25. It alleges that the seven classes contain 1,604 members in the aggregate. [59] ¶ 114. Publicis's argument that this allegation fails Rule 23(a)(1)

confuses the jurisdictional requirement of § 1332(d)(5)(B) with the certification requirement that joinder be impracticable, which is not before me.[2]

The amount in controversy is adequately alleged as well. A plaintiff's good-faith allegation of the amount in controversy controls unless it "appear[s] to a legal certainty that the claim is really for less," *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288–89 (1938), and an invocation of CAFA fails only when "any inference that the amount in controversy exceeds $5 million would be entirely speculative," *Ware v. Best Buy Stores, L.P.*, 6 F.4th 726, 733 (7th Cir. 2021). In *Ware*, the plaintiffs had not pleaded CAFA at all, invoked it only in a post-argument memorandum, and had alleged that the aggregate amount in controversy exceeded just $50,000. *Id.*

Here the complaint alleges the threshold and supplies the facts that make it plausible: 25,000 infants a year are born with Neonatal Opioid Withdrawal Syndrome, the special education services those children disproportionately require roughly double the cost of educating them, and the classes comprise more than 1,600 school districts. [59] ¶¶ 27–28, 109, 112, 114. A fact finder could lawfully award more than $5 million on those allegations, and Publicis identifies no reason to think otherwise. Subject-matter jurisdiction is adequately alleged.

[2] Even if the numerosity issue did bear on federal jurisdiction, over 1,600 plaintiffs across seven states would make joinder impracticable. *See Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) ("a forty-member class is often regarded as sufficient to meet the numerosity requirement") (quoting *Orr v. Shicker*, 953 F.3d 490, 498 (7th Cir. 2020)).

### B. Publicis Health's Settlement

In February 2024, Publicis entered consent judgments with the attorneys general of the seven states where all plaintiff school districts are located. [67-7] through [67-19]. Each attorney general released "any and all Claims that the Attorney General is authorized by law to bring and/or release … based on, arising out of, or in any way related to the Covered Conduct," and each judgment provides that the release "shall be interpreted so as to give the Released Parties the broadest possible bar against any liability relating in any way to Released Claims." [73] at 8–9 (quoting the consent judgments). Publicis argues that political subdivisions are extensions of the state, that the attorneys general therefore had authority to release the school districts' claims and did so, and that the school districts are in any event in privity with their states for purposes of res judicata. [67] at 18–25. Publicis adds that the school districts, or the counties in which they sit, have received opioid settlement funds and cannot both accept the benefits of a settlement and sue on the claims it resolved. [67] at 21–23; [73] at 11–12.

Release and res judicata are affirmative defenses on which Publicis bears the burden, and it has not carried that burden on the pleadings. The consent judgments do not purport to release the claims of school districts. Their release is coextensive with what each attorney general "is authorized by law to bring and/or release," so its reach depends on the law of each state concerning the attorney general's authority over the claims of independent local entities. Publicis's showing on that question consists of general statements about attorneys general's common-law powers and one

decision, *Nash County Board of Education v. Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981).

*Nash County* does not carry the weight Publicis assigns to it. The North Carolina attorney general in that case had declared himself the legal representative of "each public school system in this state" that bought milk with state funds, sued under a statute expressly authorizing him to represent all state-supported "organized activities," and recovered for overcharges on purchases the state had funded. *Id.* at 494. The court took care to distinguish "other antitrust suits brought by the state as *parens patriae*," noting that the action before it "would be subject to close scrutiny if it were of the *parens patriae* genre." *Id.* at 496 n.18. Nothing in Publicis's consent judgments purports to represent school districts, and nothing in them concerns state funds.

State-specific authority points the other way, and Publicis's reply does not overcome it. A Florida appellate court has held, in a dispute between the Florida attorney general and (among others) the school board of plaintiff Putnam County School District, that the attorney general "has limited common-law authority as parens patriae to litigate claims common to the state at large … but not to control claims of Appellants who assert unique and individual actual damages," and that the legislature, in creating school boards with the power to sue, "removed that authority." *Halifax Hosp. Med. Ctr. v. Office of the Att'y Gen.*, 393 So.3d 1253, 1258 (Fla. Dist. Ct. App. 2024), *review denied*, No. SC2024-1488, 2026 WL 1694598 (Fla. June 11, 2026). Publicis argues that the release in *Halifax* was narrower than its own, [73] at 10, but

the holding concerned the attorney general's authority, not the wording of the release.[3]

The New Mexico Supreme Court has rejected the proposition that its attorney general "is vested with common-law powers" over matters of statewide impact. *State ex rel. Att'y Gen. v. Reese*, 78 N.M. 241, 246–48 (1967). And the Tennessee legislature, when it wished to authorize its attorney general to release local governments' opioid claims, did so by statute for seventeen named defendants, of which Publicis is not one. Tenn. Code § 20-13-203. Publicis's answer—that the statute passed a month before its settlement and so Publicis "was clearly never contemplated," [73] at 11—confirms rather than rebuts the inference that Tennessee did not give its attorney general the authority Publicis needs. For Maine, Maryland, and West Virginia, Publicis offers no authority addressing the attorney general's power over a school district's claims at all.

The res judicata approach adds nothing. A nonparty is bound by a judgment on the theory that a party represented it only if the two had aligned interests and either the party understood itself to be acting in a representative capacity or the court took care to protect the nonparty's interests, and often only if the nonparty had notice of the suit. *Taylor v. Sturgell*, 553 U.S. 880, 894–95, 900 (2008). A political subdivision is not represented by the state merely because it is a subdivision of it. *Bank of*

---

[3] Publicis also noted that review of *Halifax* was pending in the Florida Supreme Court when it filed its reply. [73] at 10. That court has since declined review, and "[t]he decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by" the Florida Supreme Court. *Pardo v. State*, 596 So.2d 665, 666 (Fla. 1992) (quoting *Stanfill v. State*, 384 So.2d 141, 143 (Fla. 1980)).

*Kentucky v. Kentucky*, 207 U.S. 258, 265–68 (1907) (county not bound by judgment against state officers; a municipality "is not bound by former litigation, unless it was a party, either actually or by its representative," and the contrary argument would extend res judicata "further than any authority will justify"); *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1469–70 (10th Cir. 1993) (state's consent decree as *parens patriae* binds nonparties only as to "common public rights" the state was entitled to litigate, not their claims for their own injuries). Publicis has not shown that any attorney general purported to represent the school districts, gave them notice, or considered their claims. And the argument that the school districts ratified the settlements by accepting their benefits rests on a factual premise—that money paid by Publicis reached these plaintiffs—that is disputed and cannot be resolved on a motion to dismiss. [71] at 29.[4]

### C. Public Nuisance

The public nuisance claim alleges that defendants, "[t]hrough their work in marketing, promoting, distributing, and selling massive amounts of opioids," created an "unreasonable interference with rights common to the public, including to the public health, welfare, safety, peace, comfort, and convenience." [59] ¶ 120. Defendants argue that the school districts are neither private parties with a special

[4] The school districts insist that they are "government entities as a matter of law" who may sue for public nuisance without showing special injury. [71] at 33 & n.19. To the extent they sue on behalf of the public rather than for their own injuries, they assert exactly the kind of claim "common to the state at large" that an attorney general is authorized to bring and to settle, *Halifax*, 393 So.3d at 1258, and the attorneys general have settled it. The release therefore does bar the public nuisance claim insofar as it rests on the public's rights rather than on an injury to the school districts themselves. *See* below, Section III.C.

injury nor public entities with authority to sue on the public's behalf, and that they cannot recover damages for a public nuisance in any event. [65] at 36–43; [67] at 32–35; [69] at 4–5.

The special-injury requirement is dispositive. A public nuisance is "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1). Because the right interfered with belongs to the public, the action to abate a public nuisance belongs, in the first instance, to the public's representatives. A private party may sue only if it "suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference," and an action to abate may otherwise be maintained only by one who has "authority as a public official or public agency to represent the state or a political subdivision in the matter." *Id.* § 821C(1), (2)(b).

Each of the seven states follows some version of that framework. *See* Cal. Civ. Code §§ 3493–3494; *Page v. Niagara Chem. Div. of Food Mach. & Chem. Corp.*, 68 So.2d 382, 384 (Fla. 1953) (private plaintiff must show injury "different in *kind*, not merely in *degree*, from the injury to the public at large," because "the public wrong must be redressed at the suit of the state"); *Express Scripts, Inc. v. Anne Arundel Cnty.*, 493 Md. 329, 375–76 (2026) (collecting Maryland cases); *E. Me. Med. Ctr. v. Walgreen Co.*, 2025 ME 10, ¶¶ 24–28; *State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque*, 119 N.M. 150, 163–64 (1994) (adopting the

Restatement definition);[5] *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 283 (Tenn. Ct. App. 1988) (same; private recourse reserved for those who "have sustained a special or peculiar injury"); *A.D.A. ex rel. L.R.A. v. Johnson & Johnson*, 251 W.Va. 274, 295–96 (Ct. App. 2024).

The school districts do not fit either category. They are not private parties with a special injury. Their claimed injury is the cost of educating and supporting children and families harmed by opioid misuse. The Supreme Judicial Court of Maine, addressing a claim by hospitals for the unreimbursed cost of treating patients with opioid use disorder, held that such an injury "is but a subset of the injuries to the public occasioned by the increase in opioid misuse; it is no different in kind from the injury to the public," because "we all have suffered the devastating human, social, and economic effects that result from an increase in opioid misuse." *E. Me. Med. Ctr.*, 2025 ME 10, ¶ 28.

The West Virginia Intermediate Court of Appeals reached the same conclusion as to the children themselves, who "are a select few of many thousands of similarly situated potential claimants." *A.D.A.*, 251 W.Va. at 295–96. And Judge Breyer, applying the law of eight states including California, Tennessee, and West Virginia, dismissed every nuisance-based claim against McKinsey—the conspiracy claim, the aiding-and-abetting claim, and the California statutory claim—because "if everyone's injury is special, no one's is." *In re McKinsey & Co., Inc. Nat'l Prescription Opiate*

[5] New Mexico also permits "any public officer or private citizen" to bring an action to abate a public nuisance, but only "in the name of the state." N.M. Stat. § 30-8-8(B). The New Mexico plaintiffs do not invoke that statute.

*Consultant Litig.*, No. 21-md-2996, 2024 WL 2261926, at *10–12 (N.D. Cal. May 16, 2024).[6] A school district's cost of serving opioid-affected students differs from a hospital's cost of treating opioid-affected patients only in the nature of the service. It is the same injury, in the same kind.

Nor are the school districts public officials or agencies with authority to sue on the public's behalf. The school districts argue that they need not show special injury because "[p]ublic school districts are government entities as a matter of law," [71] at 33 n.19, but it is not enough to be a government entity; the entity must have "authority … to represent the state or a political subdivision in the matter." Restatement (Second) of Torts § 821C(2)(b). The Supreme Judicial Court of Maine put the point this way: "[a] government official or agency with jurisdiction to bring claims for harm caused to public property or resources has standing under the common law to bring a public nuisance action on behalf of the public," and under Maine's statutes that means the attorney general, a district attorney, or seven legal voters of the county. *E. Me. Med. Ctr.*, 2025 ME 10, ¶ 25 (citing 17 M.R.S. § 2741(2)); *see also Smedberg v. Moxie Dam Co.*, 148 Me. 302, 311 (1952) ("The State, and the State alone, on the facts set forth in this complaint has the right to complain against acts of the defendant which may constitute a public nuisance.").

[6] The school districts describe that decision as one in which Judge Breyer "refused to dismiss public nuisance claims" against a consultant. [71] at 34–35. That is not accurate. Judge Breyer held that the NAS plaintiffs had adequately alleged interference with a public right, then dismissed the nuisance-based claims in their entirety for failure to plead a special injury. *McKinsey*, 2024 WL 2261926, at *8–12.

The school districts identify no statute or common-law rule in any of the seven states that vests a school board with jurisdiction over the public health or authority to abate nuisances affecting it. And if they did sue in that capacity, they would be asserting the public's claim, which is the claim the attorneys general have already asserted and, as to Publicis, released. *See* above, Section III.B. The school districts cannot avoid the special-injury requirement by invoking a representative capacity they do not have, and cannot invoke a representative capacity without confronting the settlements their representatives made.

Two further problems confirm the result. First, as to the Maryland class, the claim is not cognizable at all. After the opening briefs were filed, the Supreme Court of Maryland (answering a question certified by the United States District Court for the District of Maryland) held that the licensed dispensing of, and administration of benefit plans for, controlled substances cannot constitute an actionable public nuisance under Maryland common law, because such conduct does not interfere with a right common to the general public; the court added that it "has never recognized a government entity's ability to recover damages for public nuisance." *Express Scripts*, 493 Md. at 413. Baltimore City's claim, which is directed at conduct one step further removed than dispensing, fails under that holding.

Second, as to every class, the school districts seek damages, [59] at 42, and cite no authority from any of the seven states permitting a governmental plaintiff to recover damages, as opposed to abatement, in a public nuisance action. Traditionally, damages are only available for private plaintiffs with special injuries. Restatement

(Second) of Torts § 821C(1). The one forward-looking request in the complaint is a one-line prayer for "injunctive relief," [59] at 42, and nothing in the pleading gives it content.

Because none of the plaintiff school districts can maintain a public nuisance action in either a private or a representative capacity, I do not decide whether the marketing of a lawful prescription drug can constitute a public nuisance in the six states other than Maryland, whether ZS's sales consulting was an "unreasonable" interference, whether Maryland, New Mexico, and Florida require control of the instrumentality, or whether the free public services doctrine bars recovery.

**D. Negligence and Gross Negligence**

The negligence and gross negligence claims allege that defendants were "Covered Persons" under the Corporate Integrity Agreement that Purdue entered with the Department of Health and Human Services in 2007, that they breached duties the agreement imposed by minimizing opioids' risks and exaggerating their benefits, and that they were negligent per se under 21 C.F.R. § 202.1(e), 18 U.S.C. § 2, and 21 U.S.C. § 846. [59] ¶¶ 126–129, 131–133. Defendants argue that they owed the school districts no duty, that the Corporate Integrity Agreement bound Purdue rather than its vendors and created no duty to third parties, and that New Mexico and Maine do not recognize gross negligence as a separate tort. [65] at 24–36; [67] at 35–41; [69] at 4. All three defendants also argue that the analysis that disposed of the racketeering claim disposes of the state-law claims too: whatever the label, the school districts' costs lie at the end of a causal chain that runs through

manufacturers, prescribers, pharmacists, and parents, and that chain is too long. [65] at 21–24, 32; [67] at 27–32; [69] at 3–4.

1. *Duty owed by defendants*

The school districts do not defend the claims as pleaded. They now say that whether any defendant "independently owed a duty to School Districts is likewise irrelevant to Counts II and III," which they describe as pleading "Defendants' derivative or accessory liability for concerted action." [71] at 17–18. But a negligence claim requires a duty running from the defendant to the plaintiff, and a party that declines to argue the point in response to a motion to dismiss forfeits it. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

Courts uniformly decline to hold that a consultant's advice to a client creates a duty of care to strangers injured by the client's use of that advice, even when the injury is foreseeable, because "[i]t is the absence of control that is significant." *In re McKinsey & Co., Inc. Nat'l Prescription Opiate Consultant Litig.*, No. 21-md-2996, 2023 WL 4670291, at *3–5 (N.D. Cal. July 20, 2023) (no duty from McKinsey to children born with neonatal abstinence syndrome); *A.D.A.*, 251 W.Va. at 299 ("we are aware of no case or legal authority that would compel such a duty"); *Abdulaziz v. McKinsey & Co.*, No. 21-2921, 2022 WL 2444925, at *3 (2d Cir. July 5, 2022).[7] The Corporate Integrity Agreement does not change that. It was an agreement between

[7] Publicis describes the 2023 *McKinsey* decision as one that "dismissed School District claims against McKinsey." [67] at 29, 38. It did not; the school districts in that litigation had settled, and the decision addressed the claims of children born with neonatal abstinence syndrome. *McKinsey*, 2023 WL 4670291, at *1. The duty holding is the same either way.

Purdue and a federal agency; the obligations it imposed ran to the government; and the original complaint alleged that it expired in May 2013, [8] ¶ 124, before most of the conduct the amended complaint describes. A compliance agreement between a manufacturer and its regulator does not create tort duties running from the manufacturer's vendors to the public.

The negligence per se theory fares no better. Two of the three provisions the complaint cites are criminal statutes, the third is an FDA regulation governing the content of manufacturers' prescription drug advertisements, 21 C.F.R. § 202.1(e), none was enacted to protect the institutions that bear the cost of drug misuse, and Maine does not recognize the doctrine. *Binette v. Dyer Library Ass'n*, 688 A.2d 898, 904 (Me. 1996). Finally, New Mexico and Maine do not recognize gross negligence as a cause of action distinct from negligence, and the school districts do not contend otherwise. *Scott v. Rizzo*, 96 N.M. 682, 687 (1981) (with the adoption of comparative negligence, "[a]lso abolished is the distinction between ordinary and gross negligence"); *Beaulieu v. Beaulieu*, 265 A.2d 610, 612 (Me. 1970) ("There are no degrees of care and no degrees of negligence in this State.").

2. *Duty and causation under the law of the seven states*

The school districts also rely on negligence as the predicate tort for their theories of derivative liability: the manufacturers, they say, owed the school districts a duty and breached it, and defendants are answerable for the breach as conspirators or aiders and abettors. [71] at 17–18, 41–43. Whether that theory can work depends on whether the manufacturers committed a negligence tort against the school

districts. Even taking the manufacturers' conduct as the starting point, defendants contend, the school districts' costs are too remote to be recoverable.

My prior order does not decide the question. The racketeering statute requires "some direct relation between the injury asserted and the injurious conduct alleged," and under that statute "foreseeability does not cut it." *Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 612 (2025); *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). The common law of most states asks a different question. Foreseeability is the touchstone, and an intervening act—"whether innocent, negligent, intentionally tortious, or criminal"—does not relieve a defendant of liability if it was the kind of act the defendant's conduct made likely. Restatement (Second) of Torts §§ 448–449.

The Court of Appeals for the Fourth Circuit recently vacated a holding that overprescribing physicians, dispensing pharmacists, and diverting users were intervening causes as a matter of West Virginia law, because "care must be taken not to label a downstream cause of an injury as an intervening cause breaking the chain of causation if that cause was foreseeable by the upstream actor." *City of Huntington v. AmerisourceBergen Drug Corp.*, 157 F.4th 547, 571 (4th Cir. 2025). And when liability is premised on conspiracy or aiding and abetting, the plaintiff need not show that the secondary actor's own conduct proximately caused the injury; it is enough that the principal's tortious conduct did, if that conduct was in furtherance of the common design or was knowingly and substantially assisted. *McKinsey*, 2024 WL 2261926, at *18; Restatement (Second) of Torts § 876. The number of independent

actors between the manufacturers' marketing and the school districts' costs is therefore not, by itself, a reason to dismiss.

Whatever the length of the chain, the school districts' injury is not physical harm to their persons or property but the cost of serving people harmed by someone else—economic loss that is wholly derivative of injuries to third parties. That kind of loss is too remote to be recovered in tort by the party who absorbs it, whatever its foreseeability. *See Perry v. Am. Tobacco Co.*, 324 F.3d 845, 849–51 (6th Cir. 2003) (affirming dismissal of health-plan subscribers' claims as too remote and collecting cases dismissing claims by union health funds, other third-party payors, and hospitals for the costs of smoking-related illness); *A.D.A.*, 251 W.Va. at 300 n.40 (marketing advice to opioid manufacturers "too attenuated from the harms alleged by the petitioners to establish proximate cause," where the petitioners were children born with neonatal abstinence syndrome). The school districts do not address that line of authority. [71] at 17–20.

The rule is one of state law. Under Maine law, an actor "has no general duty to avoid the unintentional infliction of economic loss on another," and an institution's claim for the cost of caring for a tortfeasor's victim "derives from and depends on" the tortfeasor's liability to the victim; the institution has no direct claim of its own. *E. Me. Med. Ctr.*, 2025 ME 10, ¶¶ 15–17 (hospitals could not recover from opioid sellers the cost of treating patients with opioid use disorder) (quoting Restatement (Third) of Torts: Liab. for Econ. Harm § 1(1) (2020)).

Under Tennessee law, a loss that is "entirely derivative of the harm suffered by" third persons is "too remote, as a matter of law, to support recovery," however foreseeable. *Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.*, No. W1999-01061-COA-R9-CV, 2000 WL 1390171, at *6–7 (Tenn. Ct. App. Sept. 26, 2000) (quoting *Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 239 (2d Cir. 1999)); *Perry*, 324 F.3d at 848–51 (applying Tennessee law).

Under West Virginia law, "[i]f a defendant's alleged conduct is too remote from the alleged harm, it cannot be a proximate cause even if it was foreseeable," and marketing advice to opioid manufacturers is too attenuated from the injuries of children exposed to opioids in utero to be a proximate cause of them. *A.D.A.*, 251 W.Va. at 300 n.40; *see Aikens v. Debow*, 208 W.Va. 486, 499 (2000) (no recovery for purely economic loss caused by injury to another absent physical harm, contract, or a special relationship).[8]

The school districts' cost of educating those children stands a step further from the manufacturers' conduct than the children's own injuries, and the derivative character of the loss appears from the complaint itself. For the Maine, Tennessee, and West Virginia plaintiffs, the negligence claims fail for this additional reason, and

[8] *City of Huntington* is not to the contrary. It held that prescribers, pharmacists, and diverters could not be labeled unforeseeable intervening causes of the harm to the public that two local governments sought to abate, 157 F.4th at 570–72; it did not involve a claim for economic loss derivative of injury to third persons.

negligence cannot serve as the predicate tort for the conspiracy and aiding-and-abetting theories.

For the other four states, the parties have identified no decision answering the question. Under California law, negligence liability for purely economic loss is "the exception, not the rule," and the primary exception is a special relationship. *S. Cal. Gas Leak Cases*, 7 Cal.5th 391, 400 (2019) (quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal.4th 26, 58 (1998)). And under Maryland law, a risk of economic loss alone supports a duty only where there is "an intimate nexus between the parties." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 534–35 (1986). But neither party cites those rules or any decision applying them to a public entity's costs of responding to a public health crisis.[9]

Under New Mexico law, whether a duty exists is a question of law for the court, decided on policy grounds without regard to foreseeability, *Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6; *Rodriguez v. Del Sol Shopping Ctr. Assocs.*, 2014-NMSC-014, ¶ 1, but the parties identify no New Mexico decision addressing whether a manufacturer owes a duty to the institutions that bear the cost of its product's misuse. And under Florida law, proximate cause is a question of foreseeability ordinarily reserved for the jury, *McCain v. Fla. Power Corp.*, 593 So.2d 500, 502–04 (Fla. 1992), and the parties identify no Florida decision addressing a derivative loss of this kind.

[9] The only Maryland judgment to award a local government its opioid-response costs has been vacated. *Mayor & City Council of Balt. v. McKesson Corp.*, 493 Md. 588 (2026) (per curiam) (granting certiorari, vacating, and remanding in light of *Express Scripts*).

For the California, Florida, Maryland, and New Mexico plaintiffs, the negligence claims fail for want of a duty running from defendants to them, as explained above, and I do not decide whether their loss is one they could recover from the manufacturers, because the theories that would make defendants answerable for it fail on other grounds. *See* below, Section III.E.

**E. Liability for the Manufacturers' Torts**

The amended complaint's fourth and fifth counts, labeled civil conspiracy and aiding and abetting, allege that defendants conspired with Purdue, McKinsey, and their other manufacturer clients "to create a public nuisance and to use unfair, deceptive, and unconscionably tortious or otherwise illegal means to market and boost the sale of opioids," and that they gave the manufacturers "substantial assistance to further both means and ends that they knew to be tortious or otherwise illegal." [59] ¶¶ 135, 142.

Neither is a claim in its own right. Civil conspiracy is "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." *Dunn v. Rockwell*, 225 W.Va. 43, 56 (2009) (quoting *Dixon v. Am. Indus. Leasing Co.*, 162 W.Va. 832, 834 (1979)). Aiding and abetting requires an underlying tort, knowledge of the tort on the part of the secondary actor, and substantial assistance in its commission. Restatement (Second) of Torts § 876(b); *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 486 (2023). The parties agree that each of the seven states recognizes both theories in substantially this form. [65] at 43 n.25, 50 n.30; [71] at 46, 48 n.27.

Both are ways of assigning liability for a tort someone else committed, and both therefore require that someone else have committed one. *Dunn*, 225 W.Va. at 57 (civil conspiracy "is not a *per se*, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)"); *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 201 (1995) (aider-and-abettor liability, "somewhat like civil conspiracy, requires that there exist underlying tortious activity"); *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (aiding and abetting requires that "the party whom the defendant aids performed a wrongful act causing an injury"). The two counts therefore add no claim to the public nuisance and negligence claims already addressed.

What they add is a theory under which defendants could be made to answer for those torts if the manufacturers committed them against the school districts. The school districts' response brief frames the theory that way: the manufacturers breached duties owed to the school districts, and each defendant either agreed to further that unlawful course of conduct or knowingly and substantially assisted it. [71] at 41–49.

The theory fails because the complaint does not plead a tort by the manufacturers against the school districts. The school districts identify the predicate torts as "negligence, gross negligence or both," [71] at 51, and, by the terms of the complaint itself, public nuisance, [59] ¶ 135. The nuisance predicate fails for the

reasons stated in Section III.C: the school districts have no special injury and no authority to sue on the public's behalf. *See McKinsey*, 2024 WL 2261926, at *10–12.

The negligence predicate fares no better. The complaint's only allegation on the point is that defendants "are also liable for the negligence of their co-conspirators, including their opioid manufacturer clients, and for the breaches of duties owed by their opioid manufacturer clients to third parties, including Plaintiffs and members of the State Classes." [59] ¶ 130. Nowhere does the complaint allege what duty any manufacturer owed a school district, under what state's law, or how it was breached.

The response brief attempts to supply the missing content. The manufacturers' duties, it says, are those imposed by the federal and state controlled substances acts and their implementing regulations, which require registrants to detect and report suspicious orders, and those imposed by Purdue's Corporate Integrity Agreement. [71] at 18 & n.9, 42 n.24. Neither works.

A claim of negligence per se belongs only to a plaintiff who is "one of the class of persons for whose protection the statute, ordinance, or regulation was adopted," *McKinsey*, 2024 WL 2261926, at *7 n.4, and the two opioid decisions on which the school districts themselves rely dismissed negligence per se claims by a hospital and by union health funds on precisely that ground, because the Controlled Substances Act was "intended to protect individual members of the public from falling victim to drug misuse and abuse," not the institutions that pay for the consequences. *In re Nat'l Prescription Opiate Litig.*, 452 F.Supp.3d 745, 788 (N.D. Ohio 2020); *In re Nat'l Prescription Opiate Litig.*, 440 F.Supp.3d 773, 812 (N.D. Ohio 2020).

The Corporate Integrity Agreement created no duty to the school districts on Purdue's part any more than on Publicis's. And the school districts have not argued that any manufacturer owed them a general duty of care under the law of any of the seven states. Contrast the amended complaint in *McKinsey*, which pleaded four discrete underlying torts—negligence per se, failure to warn, fraud, and public nuisance—in detail, two of which (failure to warn and negligence per se) McKinsey did not challenge on the merits. 2024 WL 2261926, at *5, *16. Without a tort committed against them, there is nothing for defendants to have conspired in or aided.[10]

**F. Statute of Limitations**

Defendants argue in the alternative that every claim is untimely. [65] at 16–21; [67] at 46–52; [69] at 2–3. The limitations periods range from one year (public nuisance in West Virginia) to six (all claims in Maine); most of the relevant periods are two to four years. [65-1]; [67] at 49–50. The school districts do not dispute the periods or the proposition that conspiracy and aiding-and-abetting claims borrow the period of the predicate tort. [67] at 49 n.31.

[10] Publicis argues that the conspiracy and aiding-and-abetting allegations sound in fraud and must satisfy Rule 9(b). [67] at 25–27; [73] at 14–15. Because the theories fail under Rule 8 for want of a predicate tort, I do not decide whether any of the allegations must also meet Rule 9(b)'s particularity requirement.

Defendants also argue that, even if a predicate tort was pleaded, the complaint does not plead their knowing participation in one. [65] at 44–46, 51–52; [67] at 43–44; [73] at 21–23; [69] at 6. Because the theories fail for want of a predicate tort, I do not decide whether any defendant's participation is adequately pleaded.

A limitations defense is rarely resolved on the pleadings, but it may be when the complaint and the matters properly before the court establish it. *Sidney Hillman*, 782 F.3d at 928. Because I have dismissed the nuisance claim on other grounds, I do not reach the school districts' argument that no limitations period runs against a continuing public nuisance, [71] at 49–50,[11] and I address limitations only as an alternative ground for dismissing the negligence claims and the conspiracy and aiding-and-abetting theories. As to those, the defense is established on the face of the pleadings.

1. *Accrual*

A negligence claim accrues when the plaintiff knows or should know that it has been injured and that the injury was wrongfully caused. The original complaint fixes the relevant dates. It alleged that all three consultants worked for Purdue "right up until Purdue stopped marketing OxyContin in 2018," [8] ¶ 118, and that Publicis's relationship with Purdue "lasted as late as 2019," [8] ¶ 122; that Endo withdrew Opana ER in July 2017 while ZS was still engaged, [8] ¶¶ 446–447; that the Practice Fusion alerts were live "from early July 2016" through the spring of 2019, [8] ¶ 331; and that Practice Fusion's deferred prosecution agreement was public in January 2020, [8] ¶ 332. The amended complaint retains most of those dates, [59] ¶¶ 51, 64, 68, 72, 92, but omits the allegation that the engagements ended with Purdue's

[11] Deciding that argument would require determining, under the law of each of the seven states, whether a nuisance "continues" when the defendant's conduct has ended and only its effects persist, and whether a marketing consultant whose engagements ended in 2019 can be said to maintain one. The parties have briefed those questions thinly, and the answer would not affect the disposition of a claim that fails at the threshold.

marketing in 2018 and the Endo dates. The school districts offer no explanation for the omission, and a plaintiff that "simply deleted" undisputed allegations from an earlier pleading, rather than contradicting them, does not thereby remove the facts they established from consideration. *See Orgone*, 912 F.3d at 1048.

As for the school districts' knowledge of their injury, two of the named plaintiffs—Baltimore City and Portland—sued the opioid manufacturers for the same injuries in 2019, and no school district disputes that it knew of its injury by then. [67] at 48; [74] at 24. The latest conduct alleged against any defendant ended in 2019, and the school districts knew of their injuries no later than that year. Measured from November 5, 2024, every period of four years or less had run.

2. *Identity of the defendant*

The school districts argue that in Maine, Maryland, and New Mexico the claim did not accrue until they learned which consultants had assisted the manufacturers. [71] at 52–53. The law of those states is otherwise. Maine's general rule is that a claim accrues when the plaintiff "sustains a judicially cognizable injury," and it has applied a discovery rule only in narrow circumstances, such as a fiduciary relationship in which the wrong was "virtually undiscoverable." *Nevin v. Union Trust Co.*, 1999 ME 47, ¶¶ 24–25. New Mexico applies a discovery rule, but a plaintiff who knows of its injury has a duty to inquire that "includes the duty to attempt to determine the identity of the wrongdoer." *Butler v. Deutsche Morgan Grenfell, Inc.*, 2006-NMCA-084, ¶ 36. And the Maryland rule is the opposite of the one the school districts describe: "knowledge of the identity of a particular defendant is not a necessary element to trigger the running of the statute of limitations." *Conaway v.*

*State*, 90 Md.App. 234, 253 (1992) (applying *Pennwalt Corp. v. Nasios*, 314 Md. 433 (1988)). The school districts' Maryland case, *Young v. Medlantic Lab'y P'ship*, 125 Md.App. 299, 307–09 (1999), distinguished *Conaway* on its facts—a patient who did not know that a laboratory, as distinct from her physician, had committed a separate wrong—and does not announce a general rule.

And even on the school districts' theory, the facts showing the consultants' involvement were public: a 2012 trade publication described Publicis's OxyContin work, [8] ¶ 123 n.66; a ZS presentation to Endo, and expert reports quoting ZS's work for opioid manufacturers, were filed on the public docket of the opioid multidistrict litigation in 2019, [8] ¶¶ 367, 439–441, and Practice Fusion's agreement with the government was announced in January 2020, [8] ¶ 332. The original complaint itself acknowledged that "recent consultant litigation"—the suits against McKinsey filed in 2021—had brought the consultants' role to light, [8] ¶ 25, and it described the school districts' master complaint in that litigation, filed on December 6, 2021, as one "filed by Plaintiffs." [8], Count I ¶ 10. Whatever the school districts did not know in 2019, they had the means to learn it years before November 2024, and they were litigating against the consultants' alleged co-conspirator by the end of 2021.

3. *Tolling*

The complaint alleges that defendants "actively concealed their roles in their clients' deceptive marketing," that the school districts "did not suspect—and had no reason to suspect" defendants' involvement, and that they "could not have acquired such knowledge earlier through the exercise of reasonable diligence." [59] ¶¶ 98–99. Fraudulent concealment requires affirmative acts of concealment by the defendant

and diligence by the plaintiff, and neither may be pleaded in conclusory terms. *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194 (1997) ("[A] plaintiff who is not reasonably diligent may not assert 'fraudulent concealment.'").

The complaint identifies no act of concealment by any defendant beyond the confidentiality that attends any consulting engagement, [59] ¶ 104, and it says nothing about what the school districts did to investigate. The Court of Appeals for the First Circuit rejected the same argument earlier this year in a suit by a city against the pharmacy benefit managers who administered opioid formularies, because the city "had ample reason to know of PBM wrongdoing and had ample means to discover the facts" from the public record of the opioid litigation. *City of Boston v. OptumRx, Inc.*, 169 F.4th 58, 62 (1st Cir. 2026). The same is true here.

4. *Application*

The consequences differ by state. Hamblen County and the three West Virginia districts first appeared in this case on November 5, 2025, and the school districts offer no basis for measuring their claims from the original filing. But the choice of date makes no difference, so I give every plaintiff the benefit of November 5, 2024. Measured from that date, the Tennessee claims (three years, Tenn. Code § 28-3-105(1)) and the West Virginia claims (two years, W. Va. Code § 55-2-12) are barred, as are the negligence claims in California (two years, Cal. Civ. Proc. Code § 335.1), Maryland (three years, Md. Code, Cts. & Jud. Proc. § 5-101), New Mexico (four years, N.M. Stat. § 37-1-4), and Florida (four years, Fla. Stat. § 95.11(3)(a) (2022)), and the conspiracy and aiding-and-abetting theories, which borrow the

period of the tort they would attach to. Only Maine's six-year period reaches back to November 2018, and the Maine plaintiffs' claims are not shown to be untimely on this record. The negligence claims, and with them the theories of derivative liability, are therefore dismissed on this alternative ground as to every plaintiff except Regional School Unit 34 and the Portland School Department.[12]

**G. Leave to Amend**

The school districts ask, in the alternative, for leave to amend "to cure any curable defects." [71] at 55. Leave should be freely given, but a court may deny it when amendment would be futile or when the plaintiff, having been put on notice of the deficiencies, has already had an opportunity to cure them and identifies nothing it would add. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015); *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 335 (7th Cir. 2018) (a court need not grant leave to amend "where a party does not request it or suggest to the court the ways in which it might cure the defects").

This is the school districts' second complaint. It was drafted with the benefit of my prior order, of the defendants' first round of motions, and of Judge Breyer's decisions explaining what a conspiracy or aiding-and-abetting theory against a

[12] ZS also argues that the free public services doctrine bars the conspiracy and aiding-and-abetting theories of the California, Florida, and West Virginia plaintiffs, and that the economic loss rule bars the negligence claims of the Maryland, California, and West Virginia plaintiffs. [65] at 33–34, 49; *see* [71] at 40–41, 53–55. Neither doctrine is settled in the relevant states as applied to a public entity's costs of responding to a public health crisis, and neither is necessary to the disposition. I do not reach the free public services doctrine. The economic loss rule overlaps with the remoteness question addressed above, Section III.D, and I consider it only to the extent stated there.

consultant requires. The defects in the public nuisance and negligence claims are legal, not factual: the school districts cannot acquire authority to sue on behalf of the public, cannot make their injury different in kind from the public's, and have disclaimed any duty running from defendants to them.

The defect in the theories of derivative liability could in principle be addressed by pleading a tort the manufacturers committed against school districts and facts showing each defendant's knowing participation in it, but the plaintiffs have not said what those facts would be, and for every plaintiff except the two Maine districts the limitations bar would remain. As for the Maine districts, Maine law does not permit recovery of their derivative economic loss, *see* above, Section III.D, so amendment would not help them either. The request for leave to amend identifies no curable defect, and I decline to grant it.

## IV. Conclusion

Defendants ZS Associates', [64], Publicis Health's, [66], and Practice Fusion's, [68], motions to dismiss are granted. The amended complaint is dismissed with prejudice. Enter judgment and terminate civil case.

ENTER:

Manish S. Shah
United States District Judge

Date: September 30, 2026